[No. C032042. Third Dist. Sept. 4, 2001.]

WARD CONNERLY, Plaintiff and Appellant, v.
STATE PERSONNEL BOARD et al., Defendants and Respondents;
CALIFORNIA BUSINESS COUNCIL FOR EQUAL OPPORTUNITY et
al., Real Parties in Interest and Appellants.

## COUNSEL

Pacific Legal Foundation, Anthony T. Caso and Sharon L. Browne for Plaintiff and Appellant.

Bill Lockyer, Attorney General, Manuel M. Medeiros and Linda A. Cabatic, Assistant Attorneys General, Catherine M. Van Aken and Paul H. Dobson, Deputy Attorneys General, for Defendants and Respondents California State Treasurer and California State Lottery Commission.

Elise S. Rose, and Dorothy Bacskai Egel for Defendant and Respondent California State Personnel Board.

Office of Legal Services and Jeff Marschner for Defendant and Respondent General Services.

Ralph D. Black for Defendants and Respondents Thomas Nussbaum as Chancellor, etc., and Board of Governors of the California Community Colleges.

Munger, Tolles & Olson, Bradley S. Phillips, Fred A. Rowley, Jr., Elizabeth Earle Beske, Steven B. Weisburd, Jeffrey L. Bleich; ACLU Foundation of Southern California, Mark Rosenbaum; Mexican American Legal Defense and Educational Fund, Theresa Fay-Bustillos, Thomas A. Saenz; Lawyers' Committee for Civil Rights of the San Francisco Bay Area, Eva J. Paterson, Oren M. Sellstrom, Michael Harris, Nancy Stuart; California Women's Law Center, Abby J. Leibman and Paula Pearlman; Employment Law Center, William McNeil and Julian Gross; Equal Rights Advocates, Inc., Beth Parker; Loyola Law School, Karl Manheim; ACLU Foundation of Northern California and Edward Chen for Real Parties in Interest and Appellants.

Louise H. Renne, City Attorney (San Francisco), Randy Riddel and Teresa L. Stricker, Deputy City Attorneys, for Local Public Entities as Amici Curiae on behalf of Real Parties in Interest and Appellants.

Michelle M. Yoshida for Mary Frances Berry, Christopher Edley, Jr., Yvonne Y. Lee, Elsie Meeks and Cruz Reynoso as Amici Curiae on behalf of Real Parties in Interest and Appellants.

## OPINION

**SCOTLAND, P. J.**—In this case, we consider whether five statutory programs that fall within the general rubric of "affirmative action" violate state and federal principles of equal protection and are contrary to article I, section 31, of our state Constitution, added by the adoption of Proposition 209 at the November 1996 General Election (hereafter Proposition 209).

The litigation, commenced by Governor Pete Wilson in his official capacity as Governor, challenges the statutory schemes on the ground that they impermissibly establish classifications and preferences based on race, ethnicity, and gender. The statutes at issue are Government Code section 8880.56, applicable to the State Lottery Commission; Government Code sections 16850 through 16857, applicable to the sale of state bonds; Government Code sections 19790 through 19799, applicable to the state civil service; Education Code sections 87100 through 87107, applicable to the California Community Colleges; and Public Contract Code sections 10115 through 10115.15, applicable to state contracting.

Plaintiff Ward Connerly (hereafter plaintiff) was later permitted to join the lawsuit as a taxpayer litigant, and he continued the litigation after Governor Wilson left office.

The trial court found invalid a portion of the statutory scheme applicable to the sale of government bonds and all of the statutory scheme applicable to state contracting, but otherwise rejected plaintiff's constitutional objections.

Plaintiff appeals from the judgment to the extent that it rejects his constitutional challenge to the statutory schemes. The real parties in interest cross-appeal, asserting that the data collection and reporting requirements applicable to state contracting may be severed from the remainder of the statutory scheme and upheld. In addition, respondent California Community Colleges raises the initial question whether plaintiff has standing to pursue this action.

We conclude (1) plaintiff has standing to maintain this litigation; (2) the statutory scheme applicable to the state lottery is invalid; (3) the statutory scheme applicable to the sale of government bonds is invalid, but a portion of the data collection and reporting requirements of the scheme may be severed and upheld; (4) the statutory scheme applicable to the state civil service is partially invalid, but the remainder of the scheme may be severed and upheld; (5) the statutory scheme applicable to the community colleges is invalid; and (6) a portion of the data collection and reporting requirements of the statutory scheme applicable to state contracting may be severed from the invalid portions of the scheme and upheld.

As we will explain, the statutory schemes at issue here were enacted over many years, some more than 20 years ago, during a time when the manner of applying equal protection principles to affirmative action programs was not settled. It has now been held that all racial classifications imposed by a governmental entity must be analyzed using the strict scrutiny standard of review. And, under our state Constitution, strict scrutiny applies to gender classifications. In addition, Proposition 209 imposes additional restrictions against racial and gender preferences and discriminatory actions.

Insofar as the challenged statutory schemes utilize race and gender classifications, we have reviewed them under strict scrutiny and Proposition 209, with the results that we have detailed above. Because our conclusion differs in some respects from the trial court's rulings, we shall reverse the judgment and remand with directions to enter a new judgment consistent with this opinion.

### DISCUSSION

### I

We begin by rejecting the claim that plaintiff lacks standing to pursue this litigation. According to the California Community Colleges, the decision in *Cornelius v. Los Angeles County etc. Authority* (1996) 49 Cal.App.4th 1761 [57 Cal.Rptr.2d 618] "suggests that [plaintiff's] state

taxpayer status should not permit him to proceed; this challenge should be deferred in favor of persons with an actual injury." We disagree.

██ California's Constitution, unlike its federal counterpart, does not contain a "case or controversy" limitation on the judicial power. (*National Paint & Coatings Assn. v. State of California* (1997) 58 Cal.App.4th 753, 761 [68 Cal.Rptr.2d 360]; see *Lujan v. Defenders of Wildlife* (1992) 504 U.S. 555, 560 [112 S.Ct. 2130, 2136, 119 L.Ed.2d 351, 364] [among other things, to establish a case or controversy under federal law, a plaintiff must have suffered an " 'injury in fact' " that is "concrete," "particularized," and " 'actual or imminent, not "conjectural" or "hypothetical" ' "].) Therefore, restrictive federal rules of justiciability do not necessarily apply in state courts. (*White v. Davis* (1975) 13 Cal.3d 757, 763 [120 Cal.Rptr. 94, 533 P.2d 222].) In particular, there are two related rules of standing applicable in state court actions that are contrary to the rules in federal courts—the right to maintain an action as a taxpayer, and the right to maintain an action as a citizen.

██ Code of Civil Procedure section 526a permits a taxpayer to bring an action to restrain or prevent an illegal expenditure of public money. No showing of special damage to a particular taxpayer is required as a requisite for bringing a taxpayer suit. (*White v. Davis, supra,* 13 Cal.3d at p. 764.) Rather, taxpayer suits provide a general citizen remedy for controlling illegal governmental activity. (*Id.* at p. 763.)

Citizen suits may be brought without the necessity of showing a legal or special interest in the result where the issue is one of public right and the object is to procure the enforcement of a public duty. (*Green v. Obledo* (1981) 29 Cal.3d 126, 144 [172 Cal.Rptr. 206, 624 P.2d 256].) Citizen suits promote the policy of guaranteeing citizens the opportunity to ensure that governmental bodies do not impair or defeat public rights. (*Ibid.*)

Taxpayer suits and citizen suits are closely related concepts of standing. (See *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 439 [261 Cal.Rptr. 574, 777 P.2d 610].) The chief difference is a taxpayer suit seeks preventative relief, to restrain an illegal expenditure, while a citizen suit seeks affirmative relief, to compel the performance of a public duty. (*Ibid.*) Where standing appears under either rule, the action may proceed regardless of the label applied by the plaintiff. (*Ibid.*)

Statutorily enacted affirmative action programs are matters of intense public concern. (*Department of Corrections v. State Personnel Bd.* (1997) 59 Cal.App.4th 131, 143 [69 Cal.Rptr.2d 34].) Hence, a claim that such a program violates principles of equal protection and Proposition 209 is

precisely the type of claim to which citizen and taxpayer standing rules apply.

Moreover, plaintiff's pursuit of this litigation is consistent with the purpose of a standing requirement, which is to ensure that courts address actual controversies between parties who have sufficient adverse interests to press their case with vigor. (*Common Cause v. Board of Supervisors, supra,* 49 Cal.3d at p. 439.) This case has been litigated intensely, and there is no danger here that the court will be misled by the failure of the parties to adequately explore and argue the issues. (*Van Atta v. Scott* (1980) 27 Cal.3d 424, 450 [166 Cal.Rptr. 149, 613 P.2d 210].)

The California Community Colleges suggest that we should deny standing to plaintiff because application of the challenged statutory schemes will produce potential plaintiffs with personal beneficial interests in the matter who will be entitled to pursue their own actions. However, "[n]umerous decisions have affirmed a taxpayer's standing to sue despite the existence of potential plaintiffs who might also have had standing to challenge the subject actions or statutes." (*Van Atta v. Scott, supra,* 27 Cal.3d at pp. 447-448, fn. omitted.)

Citing the decision in *Cornelius v. Los Angeles County etc. Authority, supra,* 49 Cal.App.4th 1761, 1774-1779, the California Community Colleges argue that we should apply a restrictive definition of "taxpayer" in order to deny taxpayer standing to plaintiff. But that case involved an action against a local government entity by a person who lacked standing as an individual, who was not a resident of the county and did not pay property taxes to the county, and whose state taxes bore only a tangential relationship to the challenged program. Whatever might be the merits of indulging in a restrictive definition of "taxpayer" in such circumstances, the decision is inapposite.

■ At oral argument, respondents added to their argument on the issue of standing. They assert that this proceeding is in mandate, that mandate addresses conduct rather than the validity of legislation, and that plaintiff cannot proceed in mandate without introducing proof that respondents are in fact engaging in unconstitutional behavior. We reject this contention for three separate reasons. First, it was raised for the first time at oral argument. (*Rebney v. Wells Fargo Bank* (1990) 220 Cal.App.3d 1117, 1138, fn. 6 [269 Cal.Rptr. 844].) Second, mandate can be used to test the constitutional validity of a legislative enactment. (*Floresta, Inc. v. City Council* (1961) 190 Cal.App.2d 599, 612 [12 Cal.Rptr. 182]; see, e.g., *Hollman v. Warren* (1948) 32 Cal.2d 351, 357, 360 [196 P.2d 562]; *Driving Sch. Assn. of Cal. v. San*

*Mateo Union High Sch. Dist.* (1992) 11 Cal.App.4th 1513, 1517, 1521-1525 [14 Cal.Rptr.2d 908].) Third, to the extent respondents suggest that we should deny plaintiff standing to challenge the statutory schemes because agencies subject to those schemes may perform their duties in a constitutional manner by either ignoring the statutory directives or by engaging in a strained interpretation thereof, the argument overlooks a critical principle of law. As we will explain more fully in subsequent portions of this opinion, an administrative agency lacks the authority to cure a facially unconstitutional statute by refusing to enforce it as written.

Here, plaintiff challenges statutory schemes enacted by the Legislature for application throughout the state and which as written, and unless restrained, will result in the expenditure of state funds consistent with their application. Plaintiff's status as a state taxpayer is sufficient to confer taxpayer standing in these circumstances.

## II

Before we decide whether the statutory programs challenged by plaintiff violate state and federal principles of equal protection and are contrary to Proposition 209, it is helpful to provide, at the outset, an overview of the rules of law that we must apply in addressing plaintiff's attack on the statutes.

## A

The equal protection clause of the Fourteenth Amendment to the United States Constitution is succinct: "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws." California's Constitution is equally terse: "A person may not be . . . denied equal protection of the laws." (Cal. Const., art. I, § 7, subd. (a).)

██ ▬ █ █ Although our state constitutional guarantee is independent of the federal guarantee, in the context of this case it is, with one exception, applied in a manner identical with the federal guarantee. (*DeRonde v. Regents of University of California* (1981) 28 Cal.3d 875, 889-890 [172 Cal.Rptr. 677, 625 P.2d 220].)[1] The one exception is with respect to gender. Under federal law, distinctions based on gender are

---

[1]The California Supreme Court considered equal protection challenges to affirmative action programs in *Bakke v. Regents of University of California* (1976) 18 Cal.3d 34 [132 Cal.Rptr. 680, 553 P.2d 1152] (hereafter *Bakke I*), *Price v. Civil Service Com.* (1980) 26 Cal.3d 257 [161 Cal.Rptr. 475, 604 P.2d 1365] (hereafter *Price*), and *DeRonde v. Regents of University of California, supra*, 28 Cal.3d 875 (hereafter *DeRonde*). Those decisions were issued prior to

subjected to heightened judicial scrutiny, but gender is not a suspect classification, as is race. (See *United States v. Virginia* (1996) 518 U.S. 515, 532 [116 S.Ct. 2264, 2275, 135 L.Ed.2d 735, 751].) Under California law, classifications based on gender are considered suspect for purposes of equal protection analysis. (*Koire v. Metro Car Wash* (1985) 40 Cal.3d 24, 37 [219 Cal.Rptr. 133, 707 P.2d 195]; *Sail'er Inn, Inc. v. Kirby* (1971) 5 Cal.3d 1, 20 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351].)

Following its adoption, the federal equal protection clause "was relegated to decades of relative desuetude" while the courts adjudicated rights under notions of substantive due process. (*University of California Regents v. Bakke* (1978) 438 U.S. 265, 291 [98 S.Ct. 2733, 2743-2744, 57 L.Ed.2d 750, 772], lead opn. of Powell J. (hereafter *Bakke II*).) With the demise of "the era of substantive due process," the equal protection clause began to attain a "measure of vitality." (*Id.* at pp. 291-292 [98 S.Ct. at p. 2749, 57 L.Ed.2d at p. 772].) In the early development of principles of equal protection, the landmark decisions arose in response to actions that discriminated against minorities, most often African-Americans. (*Id.* at p. 294 [98 S.Ct. at p. 2750, 57 L.Ed.2d at p. 773].)

■ Development of equal protection jurisprudence established that the constitutional guarantee applies to governmental classifications, whether they be legislative, executive, judicial, or administrative. Legislative classification is the act of specifying who will and who will not come within the operation of a particular law. (*Dare v. Bd. of Medical Examiners* (1943) 21 Cal.2d 790, 802 [136 P.2d 304]; *In re Cardinal* (1915) 170 Cal. 519, 521 [150 P. 348]; *County of Los Angeles v. Hurlbut* (1941) 44 Cal.App.2d 88, 93 [111 P.2d 963].)

A legislative classification satisfies equal protection of law so long as persons similarly situated with respect to the legitimate purpose of the law receive like treatment. (*Brown v. Merlo* (1973) 8 Cal.3d 855, 861 [106 Cal.Rptr. 388, 506 P.2d 212, 66 A.L.R.3d 505].)

the United States Supreme Court's development of applicable constitutional principles in opinions that we will discuss. Thus, when *Bakke I, Price,* and *DeRonde* were decided, it had not been established, as it now has, that strict scrutiny review applies to every racial classification regardless of whether it may be described as benign or remedial. Also, the California Supreme Court did not apply strict scrutiny in *Price* and *DeRonde* and, to that extent, those decisions are inconsistent with current equal protection jurisprudence. It is axiomatic that California's Constitution cannot permit the state to engage in conduct forbidden by the federal equal protection clause, and in *Price* (26 Cal.3d at pp. 284-285) and *DeRonde* (28 Cal.3d at p. 890), the court said that our state equal protection guarantee imposes no greater restrictions on affirmative action than are imposed by the federal Constitution. It follows that, in this context, federal and state equal protection standards are identical and federal standards are controlling here.

Legislative classifications generally are entitled to judicial deference, are presumptively valid, and may not be rejected by the courts unless they are palpably unreasonable. (*Asbury Hospital v. Cass County* (1945) 326 U.S. 207, 215 [66 S.Ct. 61, 65, 90 L.Ed. 6, 13]; *County of L.A. v. Southern Cal. Tel. Co.* (1948) 32 Cal.2d 378, 392 [196 P.2d 773].) However, judicial deference does not extend to laws that employ suspect classifications, such as race. Because suspect classifications are pernicious and are so rarely relevant to a legitimate governmental purpose (*Richmond v. J. A. Croson Co.* (1989) 488 U.S. 469, 505 [109 S.Ct. 706, 727-728, 102 L.Ed.2d 854, 889] (hereafter *Croson*)), they are subjected to strict judicial scrutiny; i.e., they may be upheld only if they are shown to be necessary for furtherance of a compelling state interest and they address that interest through the least restrictive means available. (*Bernal v. Fainter* (1984) 467 U.S. 216, 219-220 [104 S.Ct. 2312, 2315-2316, 81 L.Ed.2d 175, 179-180]; *Weber v. City Council* (1973) 9 Cal.3d 950, 958 [109 Cal.Rptr. 553, 513 P.2d 601].)

With the advent of affirmative action programs, it was inevitable that so-called reverse discrimination cases would come before the courts. In a series of cases, the United States Supreme Court has addressed the question.

In *Bakke II, supra*, 438 U.S. 265 [98 S.Ct. 2733, 57 L.Ed.2d 750], the court affirmed a decision of the California Supreme Court (*Bakke I, supra*, 18 Cal.3d 34), insofar as it held a race-based admissions program unlawful, but reversed insofar as it precluded the school from giving any consideration to race in the admissions process.

In *Wygant v. Jackson Board of Education* (1986) 476 U.S. 267 [106 S.Ct. 1842, 90 L.Ed.2d 260] (hereafter *Wygant*), the court invalidated a public school layoff scheme under which nonminority teachers were laid off while minority teachers with less seniority, including probationary teachers, were retained.

In *Croson, supra*, 488 U.S. 469 [109 S.Ct. 706, 102 L.Ed.2d 854], the court invalidated a city contract scheme that provided a "set-aside" for minority business enterprises.

In *Adarand Constructors, Inc. v. Pena* (1995) 515 U.S. 200 [115 S.Ct. 2097, 132 L.Ed.2d 158] (hereafter *Adarand*), the court held that, pursuant to the equal protection component of the Fifth Amendment, a federal contracting scheme that employed race-based presumptions must be judged under the same strict scrutiny standards applicable to state and local governments.

Then, in a series of cases following the 1990 census, the court found various race-based congressional reapportionment schemes to be invalid.

(*Shaw v. Hunt* (1996) 517 U.S. 899 [116 S.Ct. 1894, 135 L.Ed.2d 207]; *Shaw v. Reno* (1993) 509 U.S. 630 [113 S.Ct. 2816, 125 L.Ed.2d 511]; see also *Hunt v. Cromartie* (1999) 526 U.S. 541 [119 S.Ct. 1545, 143 L.Ed.2d 731]; *Bush v. Vera* (1996) 517 U.S. 952 [116 S.Ct. 1941, 135 L.Ed.2d 248]; *Miller v. Johnson* (1995) 515 U.S. 900 [115 S.Ct. 2475, 132 L.Ed.2d 762].)

The opinions filed in those cases demonstrate the difficulty that the United States Supreme Court has had in applying equal protection principles to affirmative action programs. The cases generally have resulted in multiple opinions from the justices. Although the court has not upheld any of the programs under consideration in those cases, the various opinions indicate that race-based governmental programs are not per se invalid but that, to be constitutionally valid, they must withstand the stringent test of strict judicial scrutiny.

From those opinions, we can distill certain principles that have been endorsed by a majority of the United States Supreme Court and must guide our consideration of the validity of the statutory schemes involved here.[2]

■ The equal protection clause recognizes that distinctions between persons based solely upon their ancestry " 'are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.' [Citation.]" (*Shaw v. Reno, supra*, 509 U.S. at p. 643 [113 S.Ct. at p. 2824, 125 L.Ed.2d at p. 526] (maj. opn.); *Bakke II, supra*, 438 U.S. at pp. 290-291 [98 S.Ct. at pp. 2748-2749, 57 L.Ed.2d at p. 771] (lead opn.).) Accordingly, the core purpose of the equal protection clause is to eliminate governmentally sanctioned racial distinctions. (*Croson, supra*, 488 U.S. at p. 495 [109 S.Ct. at pp. 722-723, 102 L.Ed.2d at p. 883] (plur. opn.); *Wygant, supra*, 476 U.S. at p. 277 [106 S.Ct. at pp. 1848-1849, 90 L.Ed.2d at p. 270] (plur. opn.).) Where the government proposes to assure participation of "some specified percentage of a particular group merely because of its race or ethnic origin, such a preferential purpose must be rejected not as insubstantial but as facially invalid. Preferring members of any one group for no reason other than race or ethnic origin is discrimination for its own sake. This the Constitution forbids." (*Bakke II, supra*, at p. 307 [98 S.Ct. at p. 2757, 57 L.Ed.2d at p. 782] (lead opn.); see also *Croson, supra*, at p. 497 [109 S.Ct. at pp. 723-724, 102 L.Ed.2d at p. 884] (plur. opn.).)

The duty of governmental entities to "eliminate every vestige of racial segregation and discrimination," and their ultimate duty to " 'do away with

---

[2] In providing citations for the principles we derive from the decisions of the United States Supreme Court, we will indicate whether the particular point is drawn from a majority opinion, plurality opinion, lead opinion, or a concurring or dissenting opinion. In some instances, the court's decision was announced through a lead opinion that obtained a concurrence of a majority in part but with portions representing a plurality. We indicate the portion of the opinion from which the point is taken.

all governmentally imposed discriminations based on race,' " are not always harmonious. (*Wygant, supra*, 476 U.S. at p. 277 [106 S.Ct. at p. 1848, 90 L.Ed.2d at p. 270] (plur. opn.).) ■ Because the rights guaranteed by the Fourteenth Amendment are not absolute, government may be permitted, in an appropriate case, to make remedial use of racial classifications. (*Adarand, supra*, 515 U.S. at p. 237 [115 S.Ct. at pp. 2117-2118, 132 L.Ed.2d at p. 188] (maj. opn.).) However, under long-standing principles of equal protection, governmental distinctions based on race are considered inherently suspect and are subjected to strict scrutiny. (*Adarand, supra*, 515 U.S. at pp. 223, 227 [115 S.Ct. at pp. 2110-2111, 2112-2113, 132 L.Ed.2d at pp. 179, 182] (maj. opn.); *Shaw v. Reno, supra*, 509 U.S. at pp. 643-644 [113 S.Ct. at pp. 2824-2825, 125 L.Ed.2d at p. 526] (maj. opn.); *Croson, supra*, 488 U.S. at p. 494 [109 S.Ct. at p. 722, 102 L.Ed.2d at p. 882] (plur. opn.).)

The strict scrutiny standard of review applies regardless of whether a law is claimed to be benign or remedial (see *Shaw v. Reno, supra*, at p. 653 [113 S.Ct. at p. 2830, 125 L.Ed.2d at p. 533] (maj. opn.); *Adarand, supra*, at p. 226 [115 S.Ct. at p. 2112, 132 L.Ed.2d at p. 181] (maj. opn.)), regardless of the race of those burdened or benefited by a particular classification (*Shaw v. Reno, supra*, at pp. 650-651 [113 S.Ct. at pp. 2828-2829, 125 L.Ed.2d at p. 531] (maj. opn.); *Croson, supra*, at p. 494 [109 S.Ct. at p. 722, 102 L.Ed.2d at p. 882] (plur. opn.)), and regardless of whether the law may be said to benefit and burden the races equally (*Shaw v. Reno, supra*, at p. 651 [113 S.Ct. at p. 2829, 125 L.Ed.2d at p. 531] (maj. opn.)).

■ And the strict scrutiny standard of review does not depend on semantic distinctions, such as "goal" rather than "quota." What is constitutionally significant is that the government has drawn a line on the basis of race or has engaged in a purposeful use of racial criteria. (*Bakke II, supra*, 438 U.S. at p. 289, & fn. 27 [98 S.Ct. at p. 2747, 57 L.Ed.2d at p. 770] (lead opn.).) A constitutional injury occurs whenever the government treats a person differently because of his or her race. (*Adarand, supra*, 515 U.S. at pp. 211, 229-230 [115 S.Ct. at pp. 2104, 2105, 2113-2114, 132 L.Ed.2d at pp. 171, 183] (maj. opn.).)

■ In applying the strict scrutiny test, it must be remembered that the rights created by the equal protection clause are not group rights; they are personal rights which are guaranteed to the individual. (*Adarand, supra*, 515 U.S. at p. 227 [115 S.Ct. at pp. 2112-2113, 132 L.Ed.2d at p. 182] (maj. opn.); *Bakke II, supra*, 438 U.S. at p. 289 [98 S.Ct. at pp. 2747-2748, 57 L.Ed.2d at p. 770] (lead opn.).) Thus, where an individual is denied an opportunity or benefit or otherwise suffers a detriment as a result of a race-based governmental scheme, it is no answer that others of his or her race secured the opportunity or benefit or avoided the detriment.

 When a governmental scheme uses a racial classification, the action is not entitled to the presumption of constitutionality which normally accompanies governmental acts. (*Croson, supra,* 488 U.S. at p. 500 [109 S.Ct. at p. 725, 102 L.Ed.2d at p. 886] (maj. opn.).) "A governmental actor cannot render race a legitimate proxy for a particular condition merely by declaring that the condition exists," and "blind judicial deference to legislative or executive pronouncements of necessity has no place in equal protection analysis." (*Id.* at pp. 500-501 [109 S.Ct. at p. 725, 102 L.Ed.2d at p. 886] (maj. opn.).)

A racial classification is presumptively invalid, and the burden is on the government to demonstrate extraordinary justification. (*Shaw v. Reno, supra,* 509 U.S. at pp. 643-644 [113 S.Ct. at p. 2824-2825, 125 L.Ed.2d at p. 526]. (maj. opn.); *Bakke II, supra,* 438 U.S. at pp. 305, 311 [98 S.Ct. at pp. 2756, 2759, 57 L.Ed.2d at pp. 781, 784] (lead opn.).) In order to justify a racial classification, the government " 'must show that its purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is "necessary . . . to the accomplishment" of its purpose or the safeguarding of its interest.' [Citations.]" (*Bakke II, supra,* at p. 305 [98 S.Ct. at p. 2756, 57 L.Ed.2d at p. 781] (lead opn.).)

Judicial review focuses on whether the racial classification is justified by a compelling governmental interest and whether the means chosen are narrowly tailored to serve that interest. (*Wygant, supra,* 476 U.S. at p. 274 [106 S.Ct. at p. 1847, 90 L.Ed.2d at p. 268] (lead opn.).)

 Under the strict scrutiny test, governmental specificity and precision are demanded. The mere recitation of a benign or legitimate purpose is entitled to little or no weight. (*Croson, supra,* 488 U.S. at p. 500 [109 S.Ct. at p. 725, 102 L.Ed.2d at p. 886] (maj. opn.).) "Racial classifications are suspect, and that means that simple legislative assurances of good intention cannot suffice." (*Id.* at p. 500 [109 S.Ct. at p. 725, 102 L.Ed.2d at p. 886] (maj. opn.).) Moreover, generalized assertions of purpose are insufficient since they provide little or no guidance for the legislative body to narrowly tailor its use of a suspect classification and because they inhibit judicial review under the strict scrutiny test. (*Id.* at p. 498 [109 S.Ct. at p. 724, 102 L.Ed.2d at p. 885] (maj. opn.).) Because racial distinctions " 'so seldom provide a relevant basis for disparate treatment, and because classifications based on race are potentially so harmful to the entire body politic, it is especially important that the reasons for any such classification be clearly identified and unquestionably legitimate.' [Citation.]" (*Id.* at p. 505 [109 S.Ct. at pp. 727-728, 102 L.Ed.2d at p. 889] (maj. opn.).)

Accordingly, before embarking upon a program that utilizes racial classifications, a governmental entity must identify its purpose with some degree

of specificity (*Croson, supra*, 488 U.S. at p. 504 [109 S.Ct. at p. 727, 102 L.Ed.2d at p. 889] (maj. opn.)) and must have convincing evidence that race-based remedial action is necessary. (*Shaw v. Hunt, supra*, 517 U.S. at p. 910 [116 S.Ct. at p. 1903, 135 L.Ed.2d at p. 222] (maj. opn.); *Wygant, supra*, 476 U.S. at pp. 277-278 [106 S.Ct. at pp. 1848-1849, 90 L.Ed.2d at p. 271] (plur. opn.).) Absent a prior determination of necessity, supported by convincing evidence, the governmental entity will be unable to narrowly tailor the remedy, and a reviewing court will be unable to determine whether the race-based action is justified. (*Croson, supra*, at p. 510 [109 S.Ct. at pp. 730-731, 102 L.Ed.2d at p. 893] (plur. opn.); *Wygant, supra*, at p. 278 [106 S.Ct. at p. 1849, 90 L.Ed.2d at p. 271] (plur. opn.).)

 Once a compelling interest is shown, the inquiry focuses on the means chosen to address the interest. It is not enough that the means chosen to accomplish the purpose are reasonable or efficient. (*Wygant, supra*, 476 U.S. at p. 279 [106 S.Ct. at pp. 1849-1850, 90 L.Ed.2d at p. 272] (plur. opn.).) Only the most exact connection between justification and classification will suffice. (*Adarand, supra*, 515 U.S. at p. 236 [115 S.Ct. at p. 2117, 132 L.Ed.2d at p. 188] (maj. opn.); *Wygant, supra*, at p. 280 [106 S.Ct. at p. 1850, 90 L.Ed.2d at p. 273] (plur. opn.).) The classification must appear necessary rather than convenient, and the availability of nonracial alternatives—or the failure of the legislative body to consider such alternatives—will be fatal to the classification. (*Croson, supra*, 488 U.S. at p. 507 [109 S.Ct. at p. 729, 102 L.Ed.2d at p. 891] (maj. opn.).) In addition, the use of a racial classification must be limited in scope and duration to that which is necessary to accomplish the legislative purpose. (*Croson, supra*, at p. 510 [109 S.Ct. at pp. 730-731, 102 L.Ed.2d at p. 893] (plur. opn.).) For example, in *Wygant,* it was asserted that a school board's interest in providing role models for its minority students could justify a race-based layoff scheme. The plurality opinion noted that nondiscriminatory hiring practices would in time achieve the desired result, while discriminatory practices based upon the role model theory would have no logical stopping point and could even lead to the thoroughly discredited separate-but-equal educational system. (*Wygant, supra*, at pp. 274-276 [106 S.Ct. at pp. 1847-1848, 90 L.Ed.2d at pp. 269-270] (plur. opn.).)

"A State's interest in remedying the effects of past or present racial discrimination may in the proper case justify a government's use of racial distinctions." (*Shaw v. Hunt, supra*, 517 U.S. at p. 909 [116 S.Ct. at p. 1902, 135 L.Ed.2d at p. 221] (maj. opn.).) However, it bears repeating that, in order to rise to the level of a compelling state interest, the use of racial classifications to remedy specific discrimination must meet two criteria.

First, the discrimination must be identified with some degree of specificity. (*Shaw v. Hunt, supra*, 517 U.S. at p. 909 [116 S.Ct. at pp. 1902-1903, 135 L.Ed.2d at p. 221] (maj. opn.).) A generalized assertion that there has been discrimination in a particular industry or region is insufficient (*ibid.*; *Croson, supra*, 488 U.S. at pp. 498-499 [109 S.Ct. at pp. 724-725, 102 L.Ed.2d at p. 885] (maj. opn.)), and mere statistical anomalies, without more, do not permit a governmental entity to employ racial classifications. (*Croson, supra*, at pp. 501-503 [109 S.Ct. at pp. 725-727, 102 L.Ed.2d at pp. 887-888] (maj. opn.).) "[T]he sorry history of both private and public discrimination in this country" (*id.* at p. 499 [109 S.Ct. at p. 724, 102 L.Ed.2d at p. 885] (maj. opn.)) does not justify an effort by government to alleviate, by use of racial distinctions, the effects of societal discrimination generally. (*Ibid.*; *Shaw v. Hunt, supra*, at p. 909 [116 S.Ct. at pp. 1902-1903, 135 L.Ed.2d at p. 221] (maj. opn.).) And "a racial classification cannot withstand strict scrutiny based upon speculation about what 'may have motivated' the legislature. . . . [T]he State must show that the alleged objective was the legislature's 'actual purpose' for the discriminatory classification . . . ." (*Shaw v. Hunt, supra*, at p. 908, fn. 4 [116 S.Ct. at p. 1902, 135 L.Ed.2d at p. 221] (maj. opn.).)

Second, "the institution that makes the racial distinction must have had a 'strong basis in evidence' to conclude that [race-based] remedial action was necessary, '*before* it embarks on an affirmative-action program,' [citation]." (*Shaw v. Hunt, supra*, 517 U.S. at p. 910 [116 S.Ct. at p. 1903, 135 L.Ed.2d at p. 222] (maj. opn.), original italics; *Croson, supra*, 488 U.S. at p. 504 [109 S.Ct. at p. 727, 102 L.Ed.2d at p. 889] (maj. opn.).) A governmental entity cannot satisfy this criterion simply by conceding past discrimination. (*Wygant, supra*, 476 U.S. at p. 278, fn. 5 [106 S.Ct. at p. 1849, 90 L.Ed.2d at pp. 271-272] (plur. opn.).) While in an appropriate case, statistical analysis may be valuable evidence, governmental entities do not have "license to create a patchwork of racial preferences based on statistical generalizations about any particular field of endeavor." (*Croson, supra*, at p. 499 [109 S.Ct. at p. 725, 102 L.Ed.2d at p. 885] (maj. opn.).)

■ Moreover, in order to be lawful, the governmental use of racial classification to redress specific discrimination must *actually* be remedial. (*Shaw v. Hunt, supra*, 517 U.S. at p. 915 [116 S.Ct. at p. 1905, 135 L.Ed.2d at p. 225] (maj. opn.).) In this respect, the remedy must be created with the awareness that the right to be free of discrimination belongs to the individual rather than any particular group. (*Id.* at p. 917 [116 S.Ct. at p. 1906, 135 L.Ed.2d at p. 226] (maj. opn.).) Thus, the remedy must be designed as nearly as possible to restore the victims of specific discriminatory conduct to the position they would have occupied in the absence of such conduct. (*Id.* at p.

915 [116 S.Ct. at p. 1905, 135 L.Ed.2d at p. 225] (maj. opn.).) Random inclusion of racial groups without individualized consideration whether the particular groups suffered from discrimination will belie a claim of remedial motivation. (*Croson, supra*, 488 U.S. at p. 506 [109 S.Ct. at p. 728, 102 L.Ed.2d at p. 890] (maj. opn.); *Wygant, supra*, 476 U.S. at p. 284, fn. 13 [106 S.Ct. at p. 1852, 90 L.Ed.2d at p. 275] (plur. opn.).) The lack of any effort to limit the benefits of a remedial scheme to those who actually suffered from specific discrimination will be fatal to the scheme. (*Croson, supra*, at p. 508 [109 S.Ct. at pp. 729-730, 102 L.Ed.2d at p. 891] (maj. opn.).)

B

■ Respondent California Community Colleges argues that, insofar as the challenged statutory schemes operate for the benefit of women, they are subject to intermediate scrutiny rather than the strict scrutiny applicable to racial classifications.

The United States Supreme Court has not held gender to be a suspect classification, like race or national origin. Instead, the court applies "skeptical scrutiny" to gender classifications. (*United States v. Virginia, supra*, 518 U.S. at p. 531 [116 S.Ct. at pp. 2274-2275, 135 L.Ed.2d at p. 750].) The linguistic formulation of skeptical scrutiny closely parallels that of strict scrutiny. Thus, there is a strong presumption that gender classifications are invalid and they must be carefully inspected by the courts. (*Id.* at pp. 532-533 [116 S.Ct. at pp. 2275-2276, 135 L.Ed.2d at p. 751].) The burden of justification is demanding, is entirely upon the government, and must be exceedingly persuasive. (*Ibid.*) The government must show that the challenged classification serves important governmental objectives and that the means employed are substantially related to the achievement of those objectives. (*Id.* at p. 533 [116 S.Ct. at pp. 2275-2276, 135 L.Ed.2d at p. 751].) "The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation," and "must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." (*Ibid.*) While this standard is similar to the strict scrutiny standard applicable to racial classifications, it is recognized as a somewhat more lenient standard of review. (See *Bakke II, supra*, 438 U.S. at pp. 302-303 [98 S.Ct. at pp. 2754-2755, 57 L.Ed.2d at p. 779] (lead opn.).)

However, our state Supreme Court has concluded that, under the equal protection guarantee of California's Constitution, gender is a suspect classification subject to strict scrutiny review. (*Koire v. Metro Car Wash, supra*, 40 Cal.3d at p. 37; *Sail'er Inn, Inc. v. Kirby, supra*, 5 Cal.3d at p. 20.)

In view of the difference between state and federal equal protection principles in this respect, respondent California Community Colleges would

have us establish a two-level system of equal protection review, with the level of scrutiny dependent upon the gender of the complaining party. But to do so would ignore the guarantee of equal protection that applies to judicial actions as well as to those of the legislative and executive branches. (See *J. E. B. v. Alabama ex rel. T. B.* (1994) 511 U.S. 127, 129, 140 [114 S.Ct. 1419, 1421-1422, 1426-1427, 128 L.Ed.2d 89, 97, 104].)

The United States Supreme Court consistently has rejected the notion that the degree of equal protection accorded an individual can be based upon the person's race or gender. As Justice Powell explained, "[t]he guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to [another] . . . . If both are not accorded the same protection, then it is not equal." (*Bakke II, supra*, 438 U.S. at pp. 289-290 [98 S.Ct. at p. 2748, 57 L.Ed.2d at pp. 770-771] (lead opn.).) The fact that a statutory scheme "discriminates against males rather than against females does not exempt it from scrutiny or reduce the standard of review." (*Mississippi University for Women v. Hogan* (1982) 458 U.S. 718, 723 [102 S.Ct. 3331, 3335-3336, 73 L.Ed.2d 1090, 1097-1098]; see also *J. E. B. v. Alabama ex rel. T. B., supra*, 511 U.S. at p. 141 [114 S.Ct. at pp. 1427-1428, 128 L.Ed.2d at pp. 104-105].)

We cannot establish different levels of equal protection for men and women out of gender prejudice and/or gender paternalism. No justification for a two-level, gender-based standard of review has been offered, and we perceive none. In fact, in rejecting a claim that it is permissible to offer promotional discounts which favor women, the California Supreme Court concluded "public policy in California mandates the *equal* treatment of men and women." (*Koire v. Metro Car Wash, supra*, 40 Cal.3d at p. 37, original italics.)[3]

Consequently, we conclude that, while the federal Constitution does not require strict scrutiny for gender classifications, our state Constitution mandates strict scrutiny without regard to the gender of the complaining party.

## C

In addition to equal protection principles, we must apply the dictates of Proposition 209.

---

[3] *Koire v. Metro Car Wash, supra*, 40 Cal.3d 24, was not a constitutional case. It involved a claim by a male that "Ladies' Day" promotions by private businesses violate the statutory Unruh Civil Rights Act (Civ. Code, § 51). Nevertheless, an exceedingly persuasive justification for unequal treatment based upon gender would have to be derived from public policy, and the decision in *Koire v. Metro Car Wash* forecloses the possibility of a state public policy supporting unequal treatment of men and women.

Article I, section 31, subdivision (a) of the Constitution of our state provides: "The State shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting." Subdivision (f) provides that, "[f]or the purposes of this section, 'State' shall include, but not necessarily be limited to, the State itself, any city, county, city and county, public university system, including the University of California, community college district, school district, special district, or any other political subdivision or governmental instrumentality of or within the State."[4]

In *Hi-Voltage Wire Works, Inc. v. City of San Jose* (2000) 24 Cal.4th 537 [101 Cal.Rptr.2d 653, 12 P.3d 1068] (hereafter *Hi-Voltage*), the California Supreme Court construed Proposition 209 in accordance with the ordinary meaning of its words. (*Id.* at p. 559.) To discriminate means " 'to make distinctions in treatment; show partiality (*in favor of*) or prejudice (*against*)' [citation] . . . ." (*Id.* at pp. 559-560.) Giving preferential treatment "means giving 'preference,' which is 'a giving of priority or advantage to one person . . . over others.' [Citation.]" (*Id.* at p. 560, fn. omitted.)

In adopting Proposition 209, the voters "intended to reinstitute the interpretation of the Civil Rights Act and equal protection that predated [the decisions in *Steelworkers v. Weber* (1979) 443 U.S. 193 [99 S.Ct. 2721, 61 L.Ed.2d 480], *Price, supra*, 26 Cal.3d 257, and other cases]," by prohibiting the state from classifying individuals by race or gender. (*Hi-Voltage, supra,* 24 Cal.4th at p. 561.)

The court in *Hi-Voltage* addressed the city's minority business enterprise and women business enterprise (MBE/WBE) contracting scheme. Under that

---

[4]The remaining portions of article I, section 31 of our state Constitution are:

"(b) This section shall apply only to action taken after the section's effective date.

"(c) Nothing in this section shall be interpreted as prohibiting bona fide qualifications based on sex which are reasonably necessary to the normal operation of public employment, public education, or public contracting.

"(d) Nothing in this section shall be interpreted as invalidating any court order or consent decree which is in force as of the effective date of this section.

"(e) Nothing in this section shall be interpreted as prohibiting action which must be taken to establish or maintain eligibility for any federal program, where ineligibility would result in a loss of federal funds to the State. [¶] . . . [¶]

"(g) The remedies available for violations of this section shall be the same, regardless of the injured party's race, sex, color, ethnicity, or national origin, as are otherwise available for violations of then-existing California antidiscrimination law.

"(h) This section shall be self-executing. If any part or parts of this section are found to be in conflict with federal law or the United States Constitution, the section shall be implemented to the maximum extent that federal law and the United States Constitution permit. Any provision held invalid shall be severable from the remaining portions of this section."

plan, a contractor bidding to do business with the city was required to either achieve a certain MBE/WBE subcontractor participation level or show that it complied with certain outreach requirements. The court noted: "The outreach component requires contractors to treat MBE/WBE subcontractors more advantageously by providing them notice of bidding opportunities, soliciting their participation, and negotiating for their services, none of which they must do for non-MBE's/WBE's. The fact prime contractors are not precluded from contacting non-MBE's/WBE's is irrelevant. The relevant constitutional consideration is that they are compelled to contact MBE's/WBE's, which are thus accorded preferential treatment within the meaning of section 31." (*Hi-Voltage, supra,* 24 Cal.4th at p. 562.)

In holding the program to be invalid, the court observed: "The participation component authorizes or encourages what amounts to discriminatory quotas or set-asides, or at least race- and sex-conscious numerical goals. [Citations.] A participation goal differs from a quota or set-aside only in degree; by whatever label, it remains 'a line drawn on the basis of race and ethnic status' as well as sex." (*Hi-Voltage, supra,* 24 Cal.4th at pp. 562-563.)

Although finding the city's outreach program unconstitutional under Proposition 209, the court acknowledged "that outreach may assume many forms, not all of which would be unlawful." (*Hi-Voltage, supra,* 24 Cal.4th at p. 565.) "Plainly, the voters intended to preserve outreach efforts to disseminate information about public employment, education, and contracting not predicated on an impermissible classification." (*Ibid.*) However, the court expressed "no opinion regarding the permissible parameters of such efforts." (*Ibid.*)

 It can be seen that Proposition 209 overlaps, but is not synonymous with, the principles of equal protection that we have described in part II. A., *ante.* Under equal protection principles, all state actions that rely upon suspect classifications must be tested under strict scrutiny, but those actions which can meet the rigid strict scrutiny test are constitutionally permissible. Proposition 209, on the other hand, prohibits discrimination against or preferential treatment to individuals or groups regardless of whether the governmental action could be justified under strict scrutiny.

In this respect, the distinction between what the federal Constitution permits and what it requires becomes particularly relevant. (See *Shaw v. Reno, supra,* 509 U.S. at p. 654 [113 S.Ct. at pp. 2830-2831, 125 L.Ed.2d at p. 533] (maj. opn.).) To the extent the federal Constitution would permit, but not require, the state to grant preferential treatment to suspect classes,

Proposition 209 precludes such action. (*Hi-Voltage, supra*, 24 Cal.4th at p. 567 [Prop. 209 contains no compelling state interest exception].)[5]

D

 The complaining party bears the initial and ultimate burden of establishing unconstitutionality. (*Wygant, supra*, 476 U.S. at pp. 277-278 [106 S.Ct. at pp. 1848-1849, 90 L.Ed.2d at p. 271] (plur. opn.).) But when the plaintiff has made a sufficient showing to trigger strict scrutiny review, the burden of justification is both demanding and entirely upon the government. (*Bakke II, supra*, 438 U.S. at p. 306 [98 S.Ct. at pp. 2756-2757, 57 L.Ed.2d at p. 781] (lead opn.); *Sail'er Inn, Inc. v. Kirby, supra*, 5 Cal.3d at pp. 16-17; see also *United States v. Virginia, supra,* 518 U.S. at p. 533 [116 S.Ct. at p. 2275, 135 L.Ed.2d at p. 751] [under intermediate scrutiny applicable under federal law to gender classifications, "[t]he burden of justification is demanding and it rests entirely on the State"].) If the government succeeds in establishing justification for the use of a suspect classification, the burden shifts back to the complaining party to show that the statutory scheme or its application is nevertheless unconstitutional.[6]

In this case, plaintiff employs the easiest means by which strict scrutiny is triggered. Laws that explicitly distinguish between individuals on racial grounds fall within the core of the prohibition of the equal protection clause and "[n]o inquiry into legislative purpose is necessary when the racial classification appears on the face of the statute." (*Shaw v. Reno, supra*, 509 U.S. at p. 642 [113 S.Ct. at p. 2824, 125 L.Ed.2d at p. 525] (maj. opn.).) Express racial classifications are immediately suspect, are presumptively invalid, and, without more, trigger strict scrutiny review. (*Id.* at pp. 642-644 [113 S.Ct. at pp. 2824-2825, 125 L.Ed.2d at pp. 525-526] (maj. opn.); see also *Adarand, supra*, 515 U.S. at p. 227 [115 S.Ct. at pp. 2112-2113, 132 L.Ed.2d at p. 182] (maj. opn.); *Bakke II, supra*, 438 U.S. at p. 289 [98 S.Ct. at pp. 2747-2848, 57 L.Ed.2d at p. 770] (lead opn.).)

To the extent the statutory schemes challenged by plaintiff employ express racial and gender classifications, he has met his initial burden by pointing that out.

---

[5] The trial court indicated that where federal equal protection principles permit a state entity to utilize race and gender classifications, Proposition 209 must yield. This confuses what the federal Constitution permits with what it requires. Proposition 209 yields where federal law requires the state to engage in particular action, but not where it would merely permit such action.

[6] We are not here concerned with the showing that might be required of the complaining party in such an instance because plaintiff has gone no further than to assert that the statutory schemes, on their face, entail unjustified use of racial and gender classifications.

█ Respondents assert that, because plaintiff makes a facial attack on the constitutionality of the statutory schemes at issue, the statutes are presumed constitutional and must be upheld unless plaintiff demonstrates constitutional conflict in every conceivable application. We disagree. (*American Academy of Pediatrics v. Lungren* (1997) 16 Cal.4th 307, 345-348 [66 Cal.Rptr.2d 210, 940 P.2d 797].)

Where a statutory scheme, on its face, employs a suspect classification, the scheme is, on its face, in conflict with the core prohibition of the equal protection clause. (*Shaw v. Reno, supra*, 509 U.S. at p. 642 [113 S.Ct. at p. 2824, 125 L.Ed.2d at p. 525] (maj. opn.).) It is not entitled to a presumption of validity and is instead presumed invalid. (*Id.* at pp. 643-644 [113 S.Ct. at pp. 2824-2825, 125 L.Ed.2d at p. 526] (maj. opn.); *Croson, supra*, 488 U.S. at p. 500 [109 S.Ct. at p. 725, 102 L.Ed.2d at p. 886] (maj. opn.).) And the express use of suspect classifications in a statutory scheme immediately triggers strict scrutiny review. (*Shaw v. Reno, supra*, at pp. 642-644 [113 S.Ct. at pp. 2824-2825, 125 L.Ed.2d at pp. 525-526] (maj. opn.).)

Under the strict scrutiny test, specificity and precision are required. (*Croson, supra*, 488 U.S. at pp. 500, 505 [109 S.Ct. at pp. 725, 727-728, 102 L.Ed.2d at pp. 886, 889] (maj. opn.).) The government cannot avoid constitutional conflict simply because a racial classification is part of a statutory scheme which is so broad and/or amorphous that it might in some instances be employed in a race-neutral manner. If the racial classification is not necessary to the statutory scheme, it may not be employed. (*Shaw v. Hunt, supra*, 517 U.S. at p. 910 [116 S.Ct. at p. 1903, 135 L.Ed.2d at p. 222] (maj. opn.); *Croson, supra*, at p. 507 [109 S.Ct. at p. 729, 102 L.Ed.2d at p. 891] (maj. opn.).) If the racial classification is necessary to the statutory scheme, it must be justified by a compelling governmental interest, and its use must be narrowly tailored to serve that interest. (*Wygant, supra*, 476 U.S. at p. 274 [106 S.Ct. at p. 1847, 90 L.Ed.2d at p. 268] (plur. opn.).)

E

In respondents' view, strict scrutiny applies only where legislation grants a preference based upon race, and not where the legislation is merely "race conscious."

█ We do not agree that a law must confer a preference before strict scrutiny applies. The United States Supreme Court could not be more certain on this point. The ultimate goal of the equal protection clause is the complete elimination of irrelevant factors such as race from governmental decision-making. (*Croson, supra*, 488 U.S. at p. 495 [109 S.Ct. at pp. 722-723, 102

L.Ed.2d at p. 883] (plur. opn.).) Regardless of the burdens or benefits imposed by or granted under a particular law, the use of a racial classification presents significant dangers to individuals, racial groups, and society at large. (*Croson, supra,* at pp. 493-494 [109 S.Ct. at pp. 721-722, 102 L.Ed.2d at p. 882] (plur. opn.).) "Racial classifications of any sort pose the risk of lasting harm to our society." (*Shaw v. Reno, supra,* 509 U.S. at p. 657 [113 S.Ct. at p. 2832, 125 L.Ed.2d at p. 535] (maj. opn.).) And without strict scrutiny, a court cannot determine whether a racial classification truly is benign or remedial. (*Id.* at p. 653 [113 S.Ct. at p. 2830, 125 L.Ed.2d at p. 533] (maj. opn.); *Adarand, supra,* 515 U.S. at p. 226 [115 S.Ct. at p. 2112, 132 L.Ed.2d at p. 181] (maj. opn.).) What is significant under the equal protection clause is that the government has drawn a line on the basis of race or ethnic status (*Bakke II, supra,* 438 U.S. at p. 289 [98 S.Ct. at pp. 2747-2748, 57 L.Ed.2d at p. 770] (lead opn.)), and laws that do so are immediately suspect. (*Shaw v. Reno, supra,* 509 U.S. at p. 642 [113 S.Ct. at p. 2824, 125 L.Ed.2d at p. 525] (maj. opn.).)

Nevertheless, we agree that a law is not subject to strict scrutiny review merely because it is "race conscious." (See *Shaw v. Reno, supra,* 509 U.S. at p. 642 [113 S.Ct. at p. 2824, 125 L.Ed.2d at p. 525] (maj. opn.).) Since the guarantee of equal protection is an individual right, where the operation of the law does not differ between one individual and another based upon a suspect classification, strict scrutiny is not required even though the law might mention matters such as race or gender. Accordingly, to use respondent California Community Colleges' example, a law prohibiting discrimination on the basis of race or gender would be race and gender conscious but would not invite strict scrutiny.[7]

■ In this respect, we agree with respondents that if a statutory provision can, by fair and reasonable interpretation, be given a meaning consistent with the requirements of the Constitution rather than in conflict with it, we must so interpret the statute in order to preserve its validity. (*Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 371 [285 Cal.Rptr. 231, 815 P.2d 304]; *People v. Davenport* (1985) 41 Cal.3d 247, 264 [221 Cal.Rptr. 794, 710 P.2d 861].)

However, as we shall explain, for the most part the statutory schemes at issue in this case, which employ express racial and gender classifications, cannot be interpreted to preserve their validity.

---

[7]Facially neutral but race-conscious legislation is not immune from strict scrutiny, but strict scrutiny is not required until the challenger makes a more detailed showing than is required for legislation that employs racial classifications. (See *Shaw v. Hunt, supra,* 517 U.S. at p. 907 [116 S.Ct. at pp. 1901-1902, 135 L.Ed.2d at p. 220] (maj. opn.); *Adarand, supra,* 515 U.S. at p. 213 [115 S.Ct. at pp. 2105-2106, 132 L.Ed.2d at p. 172] (maj. opn.).)

## F

Several respondents assert that statutory schemes which may be denominated as outreach, recruitment, or inclusive measures do not violate principles of equal protection or Proposition 209.

■ With respect to a benefit or advantage, such as admission to a school of higher education, a government job, or a public contract, the cognizable interest of a competitor is in being able to compete on an equal footing without regard to the race or gender of other competitors. (*Adarand, supra*, 515 U.S. at p. 211 [115 S.Ct. at pp. 2104-2105, 132 L.Ed.2d at p. 171] (maj. opn.).) A competitor does not have a constitutionally cognizable interest in limiting the pool of applicants with whom he or she must compete. (See *Alabama Power Co. v. Ickes* (1938) 302 U.S. 464, 479-480 [58 S.Ct. 300, 303-304, 82 L.Ed. 374, 378].) Therefore, outreach or recruitment efforts which are designed to broaden the pool of potential applicants without reliance on an impermissible race or gender classification are not constitutionally forbidden. (See *Hi-Voltage, supra*, 24 Cal.4th at p. 565.)

But if the statutory scheme relies upon race or gender classifications, it must, for equal protection analysis, be subjected to strict judicial scrutiny. And if it discriminates against or grants preference to individuals or groups based upon race or gender, it is prohibited by Proposition 209.

## G

■ Respondents contend that monitoring programs which collect and report data concerning the participation of women and minorities in governmental programs do not violate equal protection principles. We agree.

Throughout the various opinions filed in the United States Supreme Court's affirmative action cases, no justice has suggested that discrimination is a thing of the past which need not concern governmental entities. Governmental entities remain under a duty to eliminate the vestiges of segregation and discrimination. (*Wygant, supra*, 476 U.S. at p. 277 [106 S.Ct. at pp. 1848-1849, 90 L.Ed.2d at p. 270] (plur. opn.).) All of the justices agree that governmental entities may use race- and gender-neutral methods of fostering equal opportunity and that, in some instances, even race- and gender-specific remedies may be employed. Accurate and up-to-date information is the sine qua non of intelligent, appropriate legislative and administrative action. Assuming that strict scrutiny is required, a monitoring program designed to collect and report accurate and up-to-date information is justified by the compelling governmental need for such information. So long as such a

program does not discriminate against or grant a preference to an individual or group, Proposition 209 is not implicated.

## III

With all of the aforesaid principles in mind, we proceed to consider the specific statutory schemes challenged in this proceeding.

### State Lottery

The statutory provision applicable to the state lottery that plaintiff challenges is contained in Government Code section 8880.56, which is set forth in full in appendix A, *post*. (Further section references are to the Government Code unless otherwise specified.) ▮ At issue is subdivision (b)(5), which was added by the Legislature in 1986. (Stats. 1986, ch. 55, § 17, pp. 158-160, eff. Apr. 16, 1986.)[8] As we will explain, that subdivision violates principles of equal protection and Proposition 209.

With respect to the advertising or awarding of any contract for the procurement of goods and services exceeding $500,000, section 8880.56, subdivision (b)(5) imposes upon the California State Lottery Commission (the commission) and its director an "affirmative duty" of maximizing the level of participation of "socially and economically disadvantaged small business concerns" in the commission's procurement programs. The commission is required to "adopt proposal evaluation procedures, criteria, and contract terms which . . . will achieve the most feasible and practicable level of participation by socially and economically disadvantaged small business concerns . . . ." And bidders and contractors are required "to include specific plans or arrangements to utilize subcontracts with socially and economically disadvantaged small business concerns."

Economic disadvantage is a criterion that may be determined through application of race-neutral and gender-neutral financial factors. Social disadvantage is a more amorphous concept that certainly invites reliance on racial and gender classifications. But we do not have to guess as to legislative intent because the fourth paragraph of section 8880.56, subdivision (b)(5) expressly incorporates racial, ethnic, and gender classifications into the statutory meaning of "socially and economically disadvantaged." Individuals from a list of racial and ethnic backgrounds and women are conclusively presumed to be socially and economically disadvantaged regardless of their actual affluence. Persons from the excluded group, apparently only

---

[8]At the time this litigation arose, the relevant provision was subdivision (b)(4). It has subsequently been renumbered (b)(5), without substantive change. (Stats. 2000, ch. 509, § 2.)

White males, may be included if found by the commission to be disadvantaged, but the statute provides no definitional criteria, no application procedures, and no procedures for review of the commission's determination.

Even if such procedures were included in the statute, the fact that some individuals must prove disadvantage while others are conclusively presumed to be disadvantaged based solely on race, ethnicity, and gender, establishes impermissible race, ethnicity, and gender classifications. (See *Stanley v. Illinois* (1972) 405 U.S. 645, 657-658 [92 S.Ct. 1208, 1215-1216, 31 L.Ed.2d 551, 562].)

The challenged provision does more than use race, ethnicity, and gender classifications; it establishes preferences for persons from the favored groups. The commission and director are assigned the affirmative duty of maximizing participation by such persons. Selection procedures and criteria are required to accomplish that objective. And bidders and contractors are required to include specific plans or arrangements to utilize subcontracts with members of the favored groups. These provisions do not merely attempt to equalize the opportunity to participate, they establish a preference for doing business with members of the favored groups.

Section 8880.56, subdivision (b)(5) cannot even arguably withstand strict scrutiny. The absence of any identification of past discrimination by the California State Lottery, the random inclusion of groups without individualized consideration whether particular groups suffered from discrimination, the absence of any attempt to measure the recovery by the extent of the injury, the absence of any attempt to disburse the benefits of the scheme in an evenhanded manner to those who actually suffered detriment, and the absence of any geographic or temporal limits to the scheme, all serve to condemn it.

The commission and director do not attempt to justify the statute as written, but argue that they have implemented it in a constitutional manner. Specifically, they assert they have implemented it as a small business outreach statute, using the definition of small business from the Small Business Procurement and Contract Act (§ 14835 et seq.), which does not employ racial and gender classifications. They contend that, as implemented, bidders and contractors are required to make good faith efforts to reach out to minority-owned and women-owned small business concerns, but that no preference or advantage in contracting or subcontracting based on race or gender is applied.

The difficulty with this position is that the commission and director lack the authority to cure a facially unconstitutional statute by refusing to enforce

it as written. (Cal. Const., art. III, § 3.5; *Reese v. Kizer* (1988) 46 Cal.3d 996, 1002 [251 Cal.Rptr. 299, 760 P.2d 495].) We do not deal here with an ambiguous statutory provision that can be interpreted in a constitutional manner; rather, it is a statute that cannot be implemented both constitutionally and in accordance with its express terms. However well intentioned, to the extent that the commission and the director refuse to employ racial and gender preferences in implementing section 8880.56, subdivision (b)(5), they do so in disregard of express statutory requirements. While administrative interpretation may save an ambiguous statute, it cannot cure a facially invalid statute.

### *Professional Bond Services*

 The statutory provisions applicable to professional bond services that plaintiff challenges are contained in sections 16850 through 16857, which are set forth in full in appendix B, *post*. For reasons which follow, we conclude that, with one exception, the challenged provisions violate principles of equal protection and Proposition 209.

Government bonds may be issued for a variety of purposes and on behalf of a variety of state departments and agencies. The bonds must be issued in accordance with the dictates of the particular authorizing act, enacted by the electorate or by a legislative body with authority to provide for the issuance of bonds. (*Golden Gate Bridge etc. Dist. v. Filmer* (1933) 217 Cal. 754, 757-758 [21 P.2d 112, 91 A.L.R. 1].) Matters that are not governed specifically by the authorizing act or otherwise required by law are left to the broad discretion of the issuing department, agency, or officer. (*Ibid.*; see also *Kennedy v. McInturff* (1933) 217 Cal. 509, 514-515 [20 P.2d 315].)

With respect to issuance of state bonds, the State Treasurer is the sole agent for offering and selling bonds. (§ 5702.) In selling bonds on behalf of any state agency or department, the State Treasurer is required to schedule the sale of the bonds so as to coordinate the sale with the program of the department or agency necessitating the sale of the bonds. (*Ibid.*)

In the issuance of government bonds, the state may contract for the services of financial advisers, bond counsel, underwriters, underwriter's counsel, financial printers, feasibility consultants, and other professionals. (§ 16851, subd. (j).) Underwriters essentially serve as transfer agents. The State Treasurer may, in some instances, select an underwriting team without competitive bidding (§ 5703); in those situations, the State Treasurer negotiates a contract with the underwriters, and the underwriters negotiate the sale of bonds to the public. In other instances, bond underwriters are chosen

through competitive bidding; in those situations, the bonds are sold to the underwriter who submits the most favorable bid, and the underwriter then resells the bonds to the investing public.

Sections 16850 through 16857 establish minority and women business "participation goals" for professional bond service contracts. The statutory scheme establishes and utilizes racial and gender classifications. For purposes of the scheme, "minority" is defined to mean "an ethnic person of color . . . ." (§ 16851, subd. (h).) Minority business enterprises and women business enterprises are defined by reference to majority ownership and control in minorities and/or women. (§ 16851, subds. (i) & (k).) To be a minority business enterprise or a women business enterprise, a business must be at least 51 percent owned and controlled by one or more minorities or women, respectively. (§ 16851, subds. (i) & (k).) A business owned and controlled 50 percent by minorities and 50 percent by women may be counted as either but not both. (§ 16851, subd. (*l*).)

With respect to contracts awarded without competitive bidding, section 16850, subdivision (a) establishes statewide participation goals of 15 percent for MBE's and 5 percent for WBE's. The trial court found that this portion of the statutory scheme is invalid, and it is not at issue in this appeal.

With respect to contracts awarded through competitive bidding, section 16850, subdivision (a) requires each awarding department to establish minority business and women business participation goals. A "goal" is "a numerically expressed objective that awarding departments and providers of professional bond services are required to make efforts to achieve." (§ 16851, subd. (f).) The goals "apply to the overall dollar amount expended by the awarding department with respect to the contracts for professional bond services relating to the issuance of bonds by the awarding department including amounts spent as underwriter's discounts." (§ 16850, subd. (a).) These provisions establish a state preference, at least to the extent of the established goals, for doing business with individuals based upon their race and gender.

When the services of an underwriter are to be obtained by competitive bidding, the awarding department is required to, "at a minimum," (1) "[d]eliver the notice of sale[,] or other notification of intention to the [*sic*] issue the bonds[,] to all minority and women business enterprises that have listed their names with the awarding department for the purpose of this notice and [to] other qualified minority and women business enterprises known to the awarding department," (2) state in all notices that "minority and women business enterprises are encouraged to respond," and (3) require

all submitting bidders "to certify their awareness of the goals of the awarding department [for awarding contracts to minority business enterprises and women business enterprises]." (§ 16852.)

Thus, these statutory provisions entitle minority business enterprises and women business enterprises to special notice of the sale or intention to issue bonds. The State Treasurer disagrees, suggesting that section 16852 does not require special notice to such enterprises, but includes them only in the notice that is otherwise required under 16754. We are not persuaded. The State Treasurer has considerable discretion in the sale of government bonds, and section 16754 permits the sale of bonds upon such notice as the Treasurer may deem advisable. For purposes of equal protection analysis, we must view the law from the standpoint of the individual. Under the existing statutory scheme, minority businesses and women businesses may ensure that they receive notice by listing their names with the department and, if they have not done so, will receive notice so long as they are known to the department. There is no mechanism by which other businesses can ensure that they receive notice, and there is no requirement that the notice deemed advisable by the State Treasurer be such that any reasonably alert potential bidder will receive it.

Accordingly, this portion of the statutory scheme contravenes Proposition 209's prohibition against the selective dissemination of information. (*Hi-Voltage, supra,* 24 Cal.4th at pp. 562, 564.)

Moreover, the fact that all bidders are required to certify their awareness of the department's goals for the participation of minority businesses and women businesses, coupled with the imposition of a duty on providers of services to make efforts to achieve those goals, only can be intended to result in preferential treatment based upon race and gender. (See *Hi-Voltage, supra,* 24 Cal.4th at p. 562.)

With respect to contracts to be awarded through competitive bidding, the awarding department must require each bidder to identify the minority business enterprises and women business enterprises which will be used to fulfill minority and women participation goals, and to state the portion or the work to be done by each such subcontractor. (§ 16852.5, subd. (a).) And section 16852.5, subdivision (b) makes applicable to those subcontractors the Subletting and Subcontracting Fair Practices Act (Pub. Contract Code, § 4100 et seq.), which requires prime contractors to identify, in their bids, the subcontractors who will perform work under the contract, and prohibits the prime contractor from thereafter substituting any person for the subcontractor unless a statutory exception is established. (Pub. Contract Code, §§ 4104, 4107.)

Extending protections of the Subletting and Subcontracting Fair Practices Act to minority and women subcontractors for professional bond services, but not to other subcontractors, is itself a suspect classification for purposes of equal protection analysis and an impermissible preference under Proposition 209.

In addition, the statutory scheme requires an awarding department to establish a method of monitoring adherence to its minority and women participation goals, including requiring a follow-up report from all contractors upon completion of any sale of bonds. (§ 16853, subd. (a).) Each awarding department is required to file an annual report with the Governor and the Legislature stating the level of participation of minority and women businesses in professional bond service contracts and, if the department's participation goals are not met, stating the reasons for its inability to achieve the goals and the steps that will be taken in an effort to achieve the goals. (§ 16855.)

The State Treasurer claims that this portion of the statutory scheme should not be subject to strict scrutiny because there is no penalty for a failure to achieve participation goals. According to this argument, competitively bid contracts are awarded to the lowest responsible bidder without consideration of the race or gender of the bidder or of the bidder's subcontractors, and thus minority and women participation goals are irrelevant to the selection process itself. We reject this argument for two reasons.

First, the statutory scheme requires that bidders certify their awareness of participation goals and imposes upon them a duty to make efforts to achieve those goals. (§§ 16851, subd. (f), 16852, subd. (c).) Government contractors are required to act in good faith and, in assessing the validity of a statutory scheme, we cannot presume they will not do so. (Civ. Code, §§ 3529, 3548.) Regardless of whether the statutory scheme imposes a penalty for the failure to comply with the duty that it imposes, it establishes racial and gender preferences.

Second, the economic realities of the statutory scheme inevitably compel bidders to give preferences based on racial and gender classifications. Except for the special minority business enterprise and women business enterprise notice requirements, the State Treasurer and awarding departments have broad discretion in providing notice to potential bidders. While some contracts are awarded through competitive bidding, others are not. A bidder who wishes to be ensured of notice for future competitively awarded contracts, and to be considered for negotiated contracts, will know that a demonstrated ability to meet or exceed participation goals inevitably will be

a factor in the notice and selection processes. (See, e.g., § 5703, subd. (a).) Therefore, while an isolated competitive bid contract may be obtained without complying with the duty to make efforts to achieve participation goals, a bidder's hopes for future business inevitably will cause it to employ racial and gender preferences.

The statutory scheme does not arguably withstand strict scrutiny. No justification has been shown. There was no specific finding of identified prior discrimination in the contracting for professional bond services. There was no effort to measure the remedy against the consequences of identified discrimination. There was no effort to limit recovery to those who actually suffered from prior discrimination. There was no showing that non-race-based and non-gender-based remedies would be inadequate or were even considered. The scheme is unlimited in duration. And, except for its limitation to citizens and lawfully admitted aliens, the scheme is unlimited in reach.

It remains to be determined whether reporting requirements of the statutory scheme (§ 16855) may be severed and upheld. We already have decided that monitoring and reporting requirements serve a compelling government need and may be employed without violating principles of equal protection or Proposition 209. The requirement in the first sentence of section 16855, that each awarding department make an annual report "to the Governor and the Legislature on the level of participation by minority and women business enterprises in contracts as identified in this chapter," may be severed functionally and grammatically from the remainder of the statutory scheme. The consistency with which the Legislature has imposed monitoring and reporting duties on state agencies with respect to the participation of minorities and women in various programs, and the importance of such information to the Legislature, convinces us that the Legislature intended to impose this requirement regardless of the validity of the remainder of the statutory scheme. Hence, we sever and uphold this portion of the reporting requirement.

### State Civil Service

 The state civil service affirmative action provisions that plaintiff challenges are contained in sections 19790 through 19799, which are set forth in full in appendix C, *post*. We find that, with two exceptions, those provisions facially violate principles of equal protection and Proposition 209.

Pursuant to the challenged statutory scheme, each agency and department "is responsible for establishing an effective affirmative action program."

(§ 19790.) The director of each department, in cooperation with the State Personnel Board, has "the major responsibility for monitoring the effectiveness of the affirmative action program of the department." (§ 19794.) The secretary of each agency and the director of each department each is required to appoint an "affirmative action officer" with responsibility over the agency's and the department's programs. (§ 19795, subd. (a).) Bureau and division chiefs "[are] accountable to the department director for the effectiveness and results of the program within their division or bureau." (§ 19796.) All management levels, including first-line supervisors, must "provide program support and take all positive action necessary to ensure and advance equal employment opportunity at their respective levels." (§ 19796.)

An affirmative action program includes, on an annual basis, the establishment of "goals and timetables designed to overcome any identified underutilization of minorities and women in their [agency or department]." (§ 19790.) At a minimum, each agency and department must annually "identify the areas of underutilization of minorities and women within [the agency or department] by job category and level," perform "an equal employment opportunity analysis of all job categories and levels within the hiring jurisdiction," and provide "an explanation and specific actions for improving the representation of minorities and women." (§ 19797.)

For purposes of the statutory scheme, a goal is a projected level of achievement, specific to the smallest reasonable hiring unit, for correcting underutilization of minorities and women. (§ 19791, subd. (a).) A timetable is an estimate of the time required to meet specific goals. (§ 19791, subd. (b).) " 'Underutilization' means having fewer persons of a particular group in an occupation or at a level in a department than would reasonably be expected by their availability." (§ 19791, subd. (c).)

The State Personnel Board (hereafter the board) is "responsible for providing statewide advocacy, coordination, enforcement, and monitoring of [agency and department affirmative action] programs." (§§ 19790, 19792.) Among other things, the board must review and approve agency and departmental affirmative action goals and timetables. (§§ 19790, 19792, subd. (d).) The board is required to make an annual report to the Governor, the Legislature, and the Department of Finance on the accomplishment of each agency and department in meeting its goals for the past year. (§ 19793.) The Legislature must then "evaluate the equal employment opportunity efforts and affirmative action progress of state agencies during its evaluation of the Budget Bill." (§ 19793.)

And section 19798 provides that, "[i]n establishing order and subdivisions of layoff and reemployment, the board, when it finds past discriminatory hiring practices, shall by rule, adopt a process that provides that the composition of the affected work force will be the same after the completion of a layoff, as it was before the layoff procedure was implemented."

In 1995, Governor Wilson issued Executive Order No. W-124-95, which directed state agencies to eliminate employment practices based on racial and gender preferences.. Thereafter, the board revised its recommended procedures in an effort to comply with the executive order. The trial court held the statutory scheme is valid because, in light of the executive order, it appears that the statutory scheme can be implemented reasonably without racial and gender preferences.

We conclude, however, that the statutory requirements for the establishment of goals and timetables to overcome identified underutilization of minorities and women violate principles of equal protection and Proposition 209.

As the California Supreme Court noted in *Hi-Voltage, supra,* 24 Cal.4th at page 563, a participation goal differs from a quota or set-aside only in degree; it remains a line drawn on the basis of race and gender. And when the government chooses to rely upon racial and gender distinctions, the scheme is presumptively invalid; we cannot defer to legislative pronouncements, and the burden is on the government to justify the use of the distinction. (*Croson, supra,* 488 U.S. at pp. 500-501 [109 SCt. at pp. 725-726, 102 L.Ed.2d at p. 886] (maj. opn.).)

Pursuant to the statutory scheme, the board must establish requirements for improvement or corrective action to eliminate underutilization of minorities and women. (§ 19792, subd. (e).) In each agency and department, a duty is imposed on every managerial employee, from first line supervisors on up, to attempt to achieve the agency or departmental goals. (§§ 19794-19796.) Such an establishment of specific hiring goals necessarily is, in itself, the establishment of hiring preferences for purposes of equal protection and Proposition 209.

Under equal protection principles, the use of statistical underutilization to establish hiring goals suffers from a fatal flaw. The scheme can be viewed in only two ways. It may represent a decision to assure participation of "some specified percentage of a particular group" merely because of race or gender, which would be impermissible discrimination. (*Bakke II, supra,* 438 U.S. at

p. 307 [98 S.Ct. at p. 2757, 57 L.Ed.2d at p. 782] (lead opn.); see also *Croson, supra*, 488 U.S. at p. 497 [109 S.Ct. at pp. 723-724, 102 L.Ed.2d at p. 884] (plur. opn.).) Or the use of statistical underutilization to establish hiring goals may be viewed as the establishment of a conclusive presumption of prior discrimination based upon statistical disparity. The problem with this is that, while statistical underutilization may serve as significant evidence of prior discriminatory hiring practices, it is not conclusive and is not, in itself, proof of discrimination. (*Hazelwood School District v. United States* (1977) 433 U.S. 299, 312-313 [97 S.Ct. 2736, 2743-2744, 53 L.Ed.2d 768, 780].) There may be explanations other than discrimination for statistical variations, and detailed consideration of past hiring practices may rebut the inference suggested by statistical evidence. (*Ibid.*) Constitutional rights cannot be foreclosed through the use of presumptions rather than proof. (*Stanley v. Illinois, supra*, 405 U.S. at pp. 657-658 [92 S.Ct. at pp. 1215-1216, 31 L.Ed.2d at p. 562].) Accordingly, statistical anomalies, without more, do not give a governmental entity the legal authority to employ racial and gender classifications. (*Croson, supra*, 488 U.S. at pp. 499, 501-503 [109 S.Ct. at pp. 725-727, 102 L.Ed.2d at pp. 885, 887-888] (maj. opn.).)

These constitutional objections may be eliminated by severing and invalidating the requirement that state agencies and departments establish, and make efforts to achieve, goals and timetables to overcome any identified underutilization of minorities and women in state agencies and departments.

In other words, portions of the statutory scheme that provide for data collection and reporting do not suffer a constitutional defect because a determination of the underutilization of minorities and women in state service can serve legitimate and important purposes. Such a determination may indicate the need for further inquiry to ascertain whether there has been specific, prior discrimination in hiring practices. It may indicate the need to evaluate applicable hiring criteria to ensure that they are reasonably job-related and do not arbitrarily exclude members of the underutilized group. And it may indicate the need for inclusive outreach efforts to ensure that members of the underutilized group have equal opportunity to seek employment with the affected department.

One other provision of the statutory scheme requires separate discussion. Section 19798 authorizes the board, when it finds the existence of past discriminatory hiring practices, to adopt a process that alters layoff and reemployment procedures in order to maintain the racial and gender composition of the affected work force.

The burdens imposed by such a process are not diffused throughout the general population and do not affect mere hopes or expectations. Rather, they interfere with the established employment rights of specific individuals based upon race and/or gender. They are among the most severe race and gender based remedies that might be postulated. (See *Wygant, supra*, 476 U.S. at pp. 294-295 [106 S.Ct. at pp. 1857-1858, 90 L.Ed.2d at p. 282] (conc. opn. of White, J.).) Therefore, the use of such a remedy would require the most compelling justification.

Equal protection jurisprudence of the United States Supreme Court has not disapproved the possibility that such a remedy might be appropriate in some circumstance. While utilization of the authority conferred on the board by section 19798 would be subject to strict judicial scrutiny, the statute is not facially invalid under equal protection principles.

Proposition 209 is more restrictive. Alteration of layoff and reemployment schemes in order to maintain the racial and/or gender composition of the work force unquestionably would discriminate against some individuals and grant preferences to others on the basis of race and/or gender. Proposition 209 generally forbids such action. But there are exceptions to the rule established by Proposition 209. If the failure to employ the scheme authorized by section 19798 would result in ineligibility for a federal program with a loss of federal funds, or if federal law or the United States Constitution required, rather than merely permitted, the use of the scheme, Proposition 209 would not preclude it. (Cal. Const., art. I, § 31, subds. (e), (h).)

While any attempt by the board to implement an altered layoff and reemployment scheme pursuant to section 19798 would be subject to the restrictions of Proposition 209 and to strict judicial scrutiny for equal protection purposes, the granting of authority to the board to utilize such a scheme, should appropriate circumstances arise, is not invalid on its face.

### *Community Colleges*

The community college provisions that plaintiff challenges are contained in Education Code sections 87100 through 87107, which are set forth in full in appendix D, *post*. As will become apparent, they violate principles of equal protection and Proposition 209.

Community colleges are two-year secondary schools that are part of the state public school system. (Ed. Code, §§ 66010.4, 66700.) The community college system is divided into districts. (Ed. Code, § 74000.) Each district is

under the immediate control of a board of trustees (Ed. Code, § 70902), while statewide management, administration, and control over community colleges are vested in a board of governors. (Ed. Code, § 71020 et seq.)

The statutory scheme in question declares that it is "educationally sound" for (1) "the minority student attending a racially impacted school to have available the positive image provided by minority classified and academic employees," (2) "the student from the majority group to have positive experiences with minority people," and (3) "students to observe that women as well as men can assume responsible and diverse roles in society." (Ed. Code, § 87100, subd. (b).) It is further declared that "[l]essons concerning democratic principles and the richness which racial diversity brings to our national heritage can be best taught by the presence of staffs of mixed races and ethnic groups working toward a common goal." (Ed. Code, § 87100, subd. (d).)

To this end, the Legislature intended "to promote the total realization of equal employment opportunity through a continuing affirmative action employment program" with the intent "to require educational agencies to adopt and implement plans for increasing the numbers of women and minority persons at all levels of responsibility." (Ed. Code, § 87100, subd. (d).)

For purposes of this statutory scheme, an "affirmative action employment program" means "planned activities designed to seek, hire, and promote persons who are underrepresented in the work force compared to their number in the population, including handicapped persons, women, and persons of minority racial and ethnic backgrounds." It requires employers "to make additional efforts to recruit, employ, and promote members of groups formerly excluded at the various levels of responsibility who meet statewide minimum qualifications, if any, and who, relative to local qualifications beyond the statewide minimum qualifications, are qualified or may become qualified through appropriate training or experience within a reasonable length of time." The program "should be designed to remedy the exclusion, whatever its cause." (Ed. Code, § 87101, subd. (a).)

Each community college district is required to have a plan which ensures that district personnel participate in, and are committed to, the affirmative action employment program. The plan must include hiring goals and timetables for its implementation. (Ed. Code, § 87102, subd. (a).) "Goals and timetables" mean "projected new levels of employment of women and minority racial and ethnic groups to be attained on an annual schedule. . . ." (Ed. Code, § 87101, subd. (b).) The plan must include steps to be

taken "in meeting and improving hiring goals for both full-time faculty and part-time faculty" and "the development of the plan shall be a condition for receipt of allowances [for program improvement]." (Ed. Code, § 87102, subd. (a).)

The governing board of each community college district is accountable for the success or failure of its program. (Ed. Code, § 87102, subd. (a).) The governing board must periodically submit to the board of governors "an affirmation of compliance." (Ed. Code, § 87102, subd. (a).) And the board of governors has the authority to impose conditions necessary to assure reasonable progress of affirmative action, including program improvement allowances and moneys from the Faculty and Staff Diversity Fund. (Ed. Code, § 87104, subd. (a).)

The Faculty and Staff Diversity Fund is available to the board of governors for the purpose of enabling community colleges as a system to meet "the goal that by the year 2005 the system's work force will reflect proportionately the adult population of the state." (Ed. Code, § 87107, subd. (a).) The Legislature expressed the intent that, by fiscal year 1992-1993, 30 percent of all new hires in the system would be ethnic minorities. (Ed. Code, § 87107, subd. (a).) The board of governors is to use the fund for, among other things, providing for extended outreach and recruitment of underrepresented groups, providing incentives to hire members of underrepresented groups, and for in-service training and other related staff diversity programs. (Ed. Code, § 87107, subd. (d).) In administering the Faculty and Staff Diversity Fund, it is the intent that boards of governors "give funding priority and shall afford flexibility and discretion in the use of these funds to districts which have made or are making reasonable progress in contributing to the achievement of the goals of this fund." (Ed. Code, § 87107, subd. (e).)

This statutory scheme suffers from multiple constitutional faults. The establishment of an overall and continuing hiring goal—by fiscal year 1992-1993, 30 percent of new hires will be ethnic minorities and by the year 2005, the work force will proportionately reflect the adult population of the state—is, unquestionably, a preferential hiring scheme in violation of Proposition 209. Moreover, a goal of assuring participation by some specified percentage of a particular group merely because of its race or gender is "discrimination for its own sake" and must be rejected as facially invalid under equal protection principles. (*Bakke II, supra*, 438 U.S. at p. 307 [98 S.Ct. at p. 2757, 57 L.Ed.2d at p. 782] (lead opn.); see also *Croson, supra*, 488 U.S. at p. 497 [109 S.Ct. at pp. 723-724, 102 L.Ed.2d at p. 884] (plur. opn.).) And the requirement to create timetables to seek, hire, and promote minorities and women and to make reasonable progress in doing so—with

financial incentives for success and financial detriment for failure—establishes impermissible racial and gender preferences. (*Hi-Voltage, supra*, 24 Cal.4th at p. 563.)

One stated justification for the preferential hiring scheme—the role model theory (Ed. Code, § 87100, subd. (d))—has been rejected by the United States Supreme Court. (*Wygant, supra*, 476 U.S. at pp. 274-276 [106 S.Ct. at pp. 1847-8148, 90 L.Ed.2d at pp. 269-270] (plur. opn.).) The other stated justification is the belief that "[l]essons concerning democratic principles and the richness which racial diversity brings to our national heritage can be best taught by the presence of staffs of mixed races and ethnic groups . . . ." (Ed. Code, § 87100, subd. (d).) This, too, does not justify the establishment of racial and gender preferences. Lessons concerning democratic principles must include the fundamental rule of law, embodied in our state and federal Constitutions, that individuals should not be classified for different treatment based upon their race or gender.

The statutory scheme is not, as the community colleges state, an "equal employment opportunity" scheme. It says nothing about making inclusive outreach efforts to assure equal opportunity; instead, it requires efforts to seek, hire, and promote minorities and women. Success must be achieved, and underrepresentation must be eliminated. Nor, as the community colleges suggest, is it an attempt to redress specific prior discrimination; under the scheme, underrepresentation must be eliminated regardless of its cause.

And, contrary to the community colleges' claim, regulations adopted to implement the statutory scheme do not make the statutory scheme consistent with constitutional requirements. As we already have noted, administrative implementation cannot save a facially invalid statutory scheme. (Cal. Const., art. III, § 3.5; *Reese v. Kizer, supra,* 46 Cal.3d at p. 1002.)

In any event, the board of governors' regulations do not come close to implementing the scheme in a constitutional manner.

Among other things, the regulations proceed with hiring goals and time-tables and require that districts achieve success in reaching numerical workforce parity of women and minorities. (Cal. Code Regs., tit. 5, §§ 53001, subds. (a), (b), (f), (o), (p), 53003, subd. (c)(10), 53020, subd. (a), 53030, subd. (b)(3).) This is invalid discrimination for its own sake.

Although inclusive outreach efforts may be designed and carried out in a manner that does not require strict scrutiny or violate Proposition 209,

calling a scheme an outreach effort does not save it from strict scrutiny or constitutional invalidity if it in fact utilizes suspect classifications. The board's regulations do so. Recruitment must include "focused outreach" to women and minorities, and in-house or promotional only recruitment may not be used unless women and minorities have reached numerical parity in the pool of eligible employees. (Cal. Code Regs., tit. 5, § 53021, subds. (a), (b).) If members of the favored groups have not applied in sufficient numbers by the time the application period has closed, steps must be taken that include reopening the application process for additional focused recruitment. (Cal. Code Regs., tit. 5, § 53023, subd. (b).) And, after applications are screened for eligibility, the regulations specify that the process may have to be reopened again, and local qualifications may have to be abandoned, in order to ensure sufficient applicants from the favored groups. (*Ibid.*) In fact, a requirement that the process be reopened or redone may occur throughout the selection process whenever necessary to ensure there are sufficient applicants from the favored groups. (Cal. Code Regs., tit. 5, §§ 53023-53024.) This is not an inclusive outreach scheme, it is a preferential recruitment and selection process.

In addition, if the preferential recruitment and selection process has not achieved numerical parity in a reasonable time, defined in most circumstances as three years, then additional steps must be taken that include consideration of the race or gender of applicants in the selection process and the inclusion, in the applicant pool, of members of the favored groups who were previously screened out for failure to meet locally established desirable or preferred qualifications. (Cal. Code Regs., tit. 5, § 53006.) By any reckoning, this constitutes the use of hiring preferences.

Moreover, the regulations require the use of racial and gender hiring preferences without a finding of specific discrimination, without evidence that would support such a finding, and in contravention of Proposition 209.

For all of these reasons, the regulations do not save the statutory scheme.

Although we uphold the data collection and reporting aspects of other statutory schemes, we cannot do so with the community college statutes. Since their data collection and reporting requirements are entirely bound up and intermixed with the success of the preferential hiring scheme, they cannot be severed functionally and grammatically from the remainder of the statutory scheme.

### State Contracting

Public Contract Code sections 10115 through 10115.15 concern minority business and women business participation goals for state contracts. In

*Monterey Mechanical Co. v. Wilson* (9th Cir. 1997) 125 F.3d 702 (hereafter *Monterey Mechanical*), the federal court of appeals held this statutory scheme was invalid under principles of equal protection. So, too, did the trial court in this case.

The federal court in *Monterey Mechanical* did not address whether the reporting requirements in the statutory scheme (Pub. Contract Code, § 10115.5) may be severed and upheld.[9] The trial court in this case found they may not. Real parties in interest have cross-appealed, asserting that the reporting requirements should be severed and upheld.

Division One of the Court of Appeal, First Appellate District, addressed this issue in *Barlow v. Davis* (1999) 72 Cal.App.4th 1258 [85 Cal.Rptr.2d 752]. ▆▆▆ The appellate court held that, although the reporting requirements may be severed mechanically and grammatically from the invalid portions of the statutory scheme, and although the scheme includes a severability clause (Pub. Contract Code, § 10115.8), the reporting requirements find efficacy only when they are correlated with the invalidated portions of the statutory scheme and thus cannot be functionally separated. *(Barlow v. Davis, supra,* 72 Cal.App.4th at p. 1266.) We disagree.

The Legislature's right to obtain accurate and up-to-date information on matters of public concern cannot be disputed. "The power of inquiry has been employed by Congress throughout our history, over the whole range of the national interests concerning which Congress might legislate or decide upon due investigation not to legislate; it has similarly been utilized in determining what to appropriate from the national purse, or whether to appropriate. The scope of the power of inquiry, in short, is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution." *(Barenblatt v. United States* (1959) 360 U.S. 109, 111 [79 S.Ct. 1081, 1085, 3 L.Ed.2d 1115, 1120].)

The broad nature of the power of inquiry and the importance thereof have been recognized under state law. "[I]n many instances, in order to the

---

[9]Public Contract Code section 10115.5, subdivision (a) states: "Notwithstanding Section 7550.5 of the Government Code [since repealed by its own terms (Stats. 1996, ch. 970, § 1)], on January 1 of each year, each awarding department shall report to the Governor and the Legislature on the level of participation by minority, women, and disabled veteran business enterprises in contracts as identified in this article for the fiscal year beginning July 1 and ending June 30. In addition, the report shall contain the levels of participation by minority, women, and disabled veteran business enterprises for the following categories of contracts: [¶] (1) Construction. [¶] (2) Purchases of materials, supplies, and equipment. [¶] (3) Professional services. [¶] (4) All contracts for a dollar amount of less than twenty-five thousand dollars ($25,000)." Subdivision (b) of the statute states: "If the established goals are not being met, the awarding department shall report the reasons for its inability to achieve the standards and identify remedial steps it shall take."

preparation of wise and timely laws the necessity of investigation of some sort must exist as an indispensable incident and auxiliary to the proper exercise of legislative power." (*In re Battelle* (1929) 207 Cal. 227, 241 [277 P. 725, 65 A.L.R. 1497]; see also *Special Assembly Int. Com. v. Southard* (1939) 13 Cal.2d 497, 503 [90 P.2d 304].)

In our tripartite system of government, legislative function is limited to declaring the law and providing the ways and means of its accomplishment. (*California Radioactive Materials Management Forum v. Department of Health Services* (1993) 15 Cal.App.4th 841, 870-871 [19 Cal.Rptr.2d 357], disapproved on another ground in *Carmel Valley Fire Protection Dist. v. State of California* (2001) 25 Cal.4th 287, 305, fn. 5 [105 Cal.Rptr.2d 636, 20 P.3d 533].) The Legislature cannot exercise direct supervisorial control over the execution of the laws. (*Id.* at p. 872.) In this light, the statutory provisions that require data to be collected and reported to the Legislature cannot be intended as some sort of supervisorial device; they can be intended only as the basis for future legislative consideration, within the power of inquiry, with respect to the need for future legislative action.

Irrespective of the substantive elements of the statutory scheme, information concerning the participation of minority and women business enterprises in state contracts can serve a number of important and valid legislative purposes. As we have noted earlier, it may indicate the need for further inquiry to determine whether specific discrimination is occurring. It may aid the Legislature in determining whether race-neutral and gender-neutral remedies are needed. It may aid the Legislature in determining whether a scheme that does not employ suspect classifications, such as an inclusive outreach scheme, is warranted. It also may satisfy the Legislature that no further legislative action is necessary.

In these respects, the reporting requirements of the statutory scheme applicable to state contracting can serve a legislative interest separate from the substantive provisions of the scheme. The Legislature determined that the enactment of the substantive elements of the statutory scheme would not eliminate the need for further legislative inquiry, and neither will invalidation of the substantive elements of the scheme.

The reporting requirements contained in Public Contract Code section 10115.5, subdivision (a) can be severed mechanically and grammatically from the invalid portions of the act and, we conclude, may be severed functionally. Accordingly, we find the reporting provisions are valid and may be enforced separate from the invalid portions of the statutory scheme.

## DISPOSITION

The judgment is reversed, and the cause is remanded to the trial court with directions to enter a judgment consistent with the conclusions in this opinion.

Morrison, J., and Callahan, J., concurred.

Appendix A

State Lottery

The statutory provision challenged with respect to the state lottery is Government Code section 8880.56, which provides:

"(a) Notwithstanding other provisions of law, the director may purchase or lease goods and services as are necessary for effectuating the purposes of this chapter. The director may not contract with any private party for the operation and administration of the California State Lottery, created by this chapter. However, this section does not preclude procurements which integrate functions such as game design, supply, advertising, and public relations. In all procurement decisions, the director shall, subject to the approval of the commission, award contracts to the responsible supplier submitting the lowest and best proposal that maximizes the benefits to the state in relation to the areas of security, competence, experience, and timely performance, shall take into account the particularly sensitive nature of the California State Lottery and shall act to promote and ensure integrity, security, honesty, and fairness in the operation and administration of the lottery and the objective of raising net revenues for the benefit of the public purpose described in this chapter.

"(b) Notwithstanding any other provision of this chapter, the following shall apply to contracts or procurement by the lottery:

"(1) To ensure the fullest competition, the commission shall adopt and publish competitive bidding procedures for the award of any procurement or contract involving an expenditure of more than one hundred thousand dollars ($100,000). The competitive bidding procedures shall include, but not be limited to, requirements for submission of bids and accompanying documentation, guidelines for the use of requests for proposals, invitations to bid, or other methods of bidding, and a bid protest procedure. The director shall determine whether the goods or services subject to this paragraph are available through existing contracts or price schedules of the Department of General Services.

"(2) The contracting standards, procedures, and rules contained in this subdivision shall also apply with respect to any subcontract involving an expenditure of more than one hundred thousand dollars ($100,000). The commission shall establish, as part of its bidding procedures for general contracts, subcontracting guidelines that implement this requirement.

"(3) The provisions of Article 1 (commencing with Section 11250) of Chapter 3 of Part 1 of Division 3 apply to the commission.

"(4) The commission is subject to the Small Business Procurement and Contract Act, as provided in Chapter 6.5 (commencing with Section 14835) of Part 5.5 of Division 3.

"(5) In advertising or awarding any general contract for the procurement of goods and services exceeding five hundred thousand dollars ($500,000), the commission and the director shall require all bidders or contractors, or both, to include specific plans or arrangements to utilize subcontracts with socially and economically disadvantaged small business concerns. The subcontracting plans shall delineate the nature and extent of the services to be utilized, and those concerns or individuals identified for subcontracting if known.

"It is the intention of the Legislature in enacting this section to establish as an objective of the utmost importance the advancement of business opportunities for these small business concerns in the private business activities created by the California State Lottery. In that regard, the commission and the director shall have an affirmative duty to achieve the most feasible and practicable level of participation by socially and economically disadvantaged small business concerns in its procurement programs.

"By July 1, 1986, the commission shall adopt proposal evaluation procedures, criteria, and contract terms which are consistent with the advancement of business opportunities for small business concerns in the private business activities created by the California State Lottery and which will achieve the most feasible and practicable level of participation by socially and economically disadvantaged small business concerns in its procurement programs. The proposal evaluation procedures, criteria, and contract terms adopted shall be reported in writing to both houses of the Legislature on or before July 1, 1986.

"For the purposes of this section, socially and economically disadvantaged persons include women, Black Americans, Hispanic Americans, Native Americans (including American Indians, Eskimos, Aleuts, and Native Hawaiians), Asian-Pacific Americans (including persons whose origins are from Japan, China, the Philippines, Vietnam, Korea, Samoa, Guam, the United States Trust Territories of the Pacific, Northern Marianas, Laos, Cambodia, and Taiwan), and other minorities or any other natural persons found by the commission to be disadvantaged.

"The commission shall report to the Legislature by July 1, 1987, and by each July 1 thereafter, on the level of participation of small businesses, socially and economically disadvantaged businesses, and California businesses in all contracts awarded by the commission.

"(6) The commission shall prepare and submit to the Legislature by October 1 of each year a report detailing the lottery's purchase of goods and services through the Department of General Services. The report shall also include a listing of contracts awarded for more than one hundred thousand dollars ($100,000), the name of the contractor, amount and term of the contract, and the basis upon which the contract was awarded.

"The lottery shall fully comply with the requirements of paragraphs (2) to (5), inclusive, except that any function or role which is otherwise the responsibility of the Department of Finance or the Department of General Services shall instead, for purposes of this subdivision, be the sole responsibility of the lottery, which shall have the sole authority to perform that function or role."

## Appendix B

### Professional Bond Services

The following sections of the Government Code concern affirmative action with respect to professional bond services. The portions of the statutory scheme found to be invalid by the trial court are in italics:

Section 16850: "(a) *Notwithstanding any other provision of law, each awarding department shall have annual statewide participation goals of not less than 15 percent for minority business enterprises and 5 percent for women business enterprises for contracts entered into by the awarding department during the year for each of the professional bond services. This section shall not apply if a contract for professional bond services of an underwriter is to be obtained by competitive bid.* However, each awarding department shall establish goals for contracts to be obtained by competitive bid for professional bond services, as defined in Section 16851.

"These goals shall apply to the overall dollar amount expended by the awarding department with respect to the contracts for professional bond services relating to the issuance of bonds by the awarding department including amounts spent as underwriter's discounts.

"*(b) In attempting to meet the goals set forth in subdivision (a), the awarding department shall consider establishing cocounsel, joint venture, and subcontracting relationships including minority business enterprises and women business enterprises in all contracts for bonds awarded by the awarding department. However, nothing in this article shall preclude the awarding department from achieving the goals set forth in this section without requiring joint ventures, cocounsel, or subcontracting arrangements.*

"*(c) This section shall not limit the ability of any awarding department to meet a goal higher than those set forth in subdivision (a) for participation by minority and women business enterprises in contracts awarded by the awarding department.*

"(d) Nothing in this chapter shall be construed to authorize any awarding department to discriminate in the awarding of any contract on the basis of race, color, sex, ethnic origin, or ancestry."

Section 16851: "As used in this chapter, the following definitions apply:

"(a) 'Awarding department' means any agency, department, constitutional officer, governmental entity, or other officer or entity of the state empowered by law to issue bonds on behalf of the State of California.

"(b) 'Bonds' means bonds, notes, warrants, certificates of participation, and other evidences of indebtedness issued by or on behalf of the State of California.

"(c) 'Contract' includes any contract, agreement, or joint agreement to provide professional bond services to the State of California or an awarding department.

"(d) 'Contractor' means any provider of professional bond services who enters into a contract with an awarding department.

"(e) 'Foreign corporation,' 'foreign firm,' or 'foreign-based business' means a business entity that is incorporated or has its principal headquarters located outside the United States.

"(f) 'Goal' means a numerically expressed objective that awarding departments and providers of professional bond services are required to make efforts to achieve.

"(g) 'Management and control' means effective and demonstrable management of the business entity.

"(h) 'Minority' means an ethnic person of color including American Indians, Asians (including, but not limited to, Chinese, Japanese, Koreans, Pacific Islanders, Samoans, and Southeast Asians), Blacks, Filipinos, and Hispanics. A minority must be a citizen of the United States or a lawfully admitted permanent resident as defined in Title 8 U.S.C. 1101(a)(20).

"(i) 'Minority business enterprise' means a business concern that meets all of the following requirements:

"(1) A sole proprietorship owned by a minority; a firm or partnership, at least 51 percent of the voting stock or partnership interests of which are owned by one or more minorities; a subsidiary which is wholly owned by a parent corporation but only if at least 51 percent of the voting stock of the parent corporation is owned by one or more minorities; or a joint venture in which at least 51 percent of the joint venture's management of the joint venture business and at least 51 percent of the joint venture's earnings are controlled or retained by the minority participants in the joint venture.

"(2) Management and control of daily business operations by one or more minorities although not necessarily the same minorities who are owners of the business.

"(3) A sole proprietorship, corporation, joint venture, or partnership with its home office located in the United States, which is not a branch or subsidiary of a foreign corporation, foreign firm, or other foreign-based business.

"(j) 'Professional bond services' include services as financial advisers, bond counsel, underwriters in negotiated transactions, underwriter's counsel, financial printers, feasibility consultants, and other professional services related to the issuance and sale of bonds.

"(k) A woman owner of a women business enterprise must be a citizen of the United States or a lawfully admitted permanent resident as defined in Title 8 U.S.C. 1101(a)(20).

" 'Women business enterprise' means a business concern that is all of the following:

"(1) A sole proprietorship owned by a woman; a firm or partnership, at least 51 percent of the voting stock or partnership interests of which are owned by one or more women; a subsidiary which is wholly owned by a parent corporation but only if at least 51 percent of the voting stock of the parent corporation is owned by one or more women; or a joint venture in which at least 51 percent of the joint venture's management of the joint venture business and at least 51 percent of the joint venture's earnings are controlled or retained by the women participants in the joint venture.

"(2) Management and control of daily business operations by one or more women although not necessarily the same women who are the owners of the business.

"(3) A sole proprietorship, corporation, joint venture, or partnership with its home office located in the United States, which is not a branch or subsidiary of a foreign corporation, foreign firm, or other foreign-based business.

"(*l*) 'Minority business enterprise' and 'women business enterprise,' include an enterprise of which 50 percent is owned and controlled by one or more minorities and the other 50 percent is owned and controlled by one or more women, or, in the case of a publicly owned business, 50 percent of the stock of which is owned and controlled by one or more minorities and the other 50 percent is owned and controlled by one or more women. Any business enterprise so defined may be counted as either a minority business enterprise or a women business enterprise for purposes of meeting the

participation goals, but no one such business enterprise shall be counted as meeting the participation goals in both categories."

Section 16852: "Notwithstanding Section 16850, if a contract for professional bond services of an underwriter is to be obtained by competitive bid, the awarding department shall, at a minimum, take all of the following actions:

"(a) Deliver the notice of sale or other notification of intention to the [*sic*] issue the bonds to all minority and women business enterprises that have listed their names with the awarding department for the purpose of this notice and other qualified minority and women business enterprises known to the awarding department.

"(b) State in all notices of sale and other notifications of intention to issue bonds that minority and women business enterprises are encouraged to respond.

"(c) Require all submitting bidders to certify their awareness of the goals of the awarding department in accordance with this chapter.

"(d) Nothing in this section shall be construed to authorize any awarding department to discriminate in the solicitation of bids or in the awarding of contracts on the basis of race, color, sex, ethnic origin, or ancestry."

Section 16852.5: "(a) Any awarding department taking bids in connection with the award of any contract shall provide, in the general conditions under which bids will be received, that any person making a bid or offer to perform a contract shall, in his or her bid or offer, set forth the following information:

"(1) The name and the location of the place of business of each subcontractor certified as a minority, women, or disabled veteran business enterprise who will perform work or labor or render service to the prime contractor in connection with the performance of the contract and who will be used by the prime contractor to fulfill minority, women, and disabled veteran business enterprise participation goals.

"(2) The portion of work that will be done by each subcontractor under paragraph (1). The prime contractor shall list only one subcontractor for each portion of work as is defined by the prime contractor in his or her bid or offer.

"(b) The Subletting and Subcontracting Fair Practices Act (Chapter 4 (commencing with Section 4100) of Part 1 of Division 2 of the Public

Contract Code) shall apply to the information required by subdivision (a) relating to subcontractors certified as minority, women, and disabled veteran business enterprises.

"(c) For purposes of this section, 'subcontractor' and 'prime contractor' shall have the same meaning as those terms are defined in Section 4113 of the Public Contract Code."

Section 16853: "(a) The awarding department shall establish a method of monitoring adherence to the goals specified in Section 16850, including requiring a followup report from all contractors upon the completion of any sale of bonds.

"(b) The awarding department shall adopt rules and regulations for the purpose of implementing this section. Emergency regulations consistent with this section may be adopted."

Section 16854: "In implementing this chapter, the awarding department shall utilize existing resources such as the Office of Small and Minority Business."

Section 16855: "Beginning July 1, 1989, and on January 1, 1990, and on January 1 of each year thereafter, each awarding department shall report to the Governor and the Legislature on the level of participation by minority and women business enterprises in contracts as identified in this chapter. If the established goals are not met, the awarding department shall report the reasons for its inability to achieve the goals and identify steps it shall take in an effort to achieve the goals."

Section 16856: "(a) Notwithstanding anything in this chapter to the contrary, the validity or enforceability of any bonds to which this chapter applies shall not be affected in any way by the failure of an awarding department to meet the goals established under this chapter.

"(b) No action may be maintained to enjoin the issuance of any bonds to which this chapter applies or the enforcement of any contract for professional bond services based on an awarding department's failure to meet the goals set forth in Section 16850."

Section 16857: "(a) It shall be unlawful for a person to:

"(1) Knowingly and with intent to defraud, fraudulently obtain, retain, attempt to obtain or retain, or aid another in fraudulently obtaining or

retaining or attempting to obtain or retain, acceptance or certification as a minority, women, or disabled veteran business enterprise, for the purposes of this chapter.

"(2) Willfully and knowingly make a false statement with the intent to defraud, whether by affidavit, report, or other representation, to a state official or employee for the purpose of influencing the acceptance or certification or denial of acceptance or certification of any entity as a minority, women, or disabled veteran business enterprise.

"(3) Willfully and knowingly obstruct, impede, or attempt to obstruct or impede, any state official or employee who is investigating the qualifications of a business entity which has requested acceptance or certification as a minority, women, or disabled veteran business enterprise.

"(4) Knowingly and with intent to defraud, fraudulently obtain, attempt to obtain, or aid another person in fraudulently obtaining or attempting to obtain, public moneys to which the person or firm is not entitled under this chapter.

"(5) Establish, or cooperate in the establishment of, or exercise control over, a firm found to have violated any of paragraphs (1) to (4), inclusive. Any person or firm who violates this paragraph is guilty of a misdemeanor and shall be liable for a civil penalty not to exceed fifty thousand dollars ($50,000) for the first violation, and a civil penalty not to exceed two hundred thousand dollars ($200,000) for each additional or subsequent violation.

"(6) This section shall not apply to minority and women business enterprise programs conducted by public utility companies pursuant to the California Public Utilities Commission's General Order 156.

"(b) Any person who violates paragraphs (1) to (4), inclusive, of subdivision (a) is guilty of a misdemeanor and shall be liable for a civil penalty not to exceed five thousand dollars ($5,000) for the first violation, and a civil penalty not to exceed twenty thousand dollars ($20,000) for each additional or subsequent violation.

"(c) Any person or firm that violates subdivision (a) shall, in addition to the penalties provided for in subdivision (b), be suspended from bidding on, or participating as either a contractor or subcontractor in, any contract awarded by the state for a period of not less than 30 days nor more than one year. However, for an additional or subsequent violation, the period of

suspension shall be extended for a period of up to three years. Any person or firm that fails to satisfy the penalties imposed pursuant to subdivisions (b) and (c) shall be prohibited from further contracting with the state until the penalties are satisfied.

"(d) The awarding department shall report all alleged violations of this section to the Office of Small and Minority Business. The office shall subsequently report all alleged violations to the Attorney General who shall determine whether to bring a civil action against any person or firm for violation of this section.

"(e) The office shall monitor the status of all reported violations and shall maintain and make available to all state departments a central listing of all firms and persons who have been determined to have committed violations resulting in suspension.

"(f) No awarding department shall enter into any contract with any person or firm suspended for violating this section during the period of the person's or firm's suspension. No awarding department shall award a contract to any contractor utilizing the services of any person or firm as a subcontractor suspended for violating this section during the period of the person's or firm's suspension.

"(g) The awarding department shall check the central listing provided by the office to verify that the person, firm, or contractor to whom the contract is being awarded, or any person, or firm, being utilized as a subcontractor by that person, firm, or contractor, is not under suspension for violating this section."

## Appendix C

### The State Civil Service

The following Government Code provisions apply to affirmative action in the state civil service:

Section 19790: "Each agency and department is responsible for establishing an effective affirmative action program. The State Personnel Board shall be responsible for providing statewide advocacy, coordination, enforcement, and monitoring of these programs.

"Each agency and department shall establish goals and timetables designed to overcome any identified underutilization of minorities and women in their respective organizations. Agencies and departments shall determine their annual goals and timetables by June 1 of each year beginning in 1978. These goals and timetables shall be made available to the public upon request. All goals and timetables shall then be submitted to the board for review and approval or modification no later than July 1 of each year."

Section 19791: "As used in this chapter:

"(a) 'Goal' means a projected level of achievement resulting from an analysis by the employer of its deficiencies in utilizing minorities and women and what reasonable remedy is available to correct such underutilization. Goals shall be specific by the smallest reasonable hiring unit, and shall be established separately for minorities and women.

"(b) 'Timetable' means an estimate of the time required to meet specific goals.

"(c) 'Underutilization' means having fewer persons of a particular group in an occupation or at a level in a department than would reasonably be expected by their availability."

Section 19792: "The State Personnel Board shall:

"(a) Provide statewide leadership designed to achieve positive and continuing affirmative action programs in the state civil service.

"(b) Develop, implement, and maintain affirmative action and equal employment opportunity guidelines.

"(c) Provide technical assistance to state departments in the development and implementation of their affirmative action programs.

"(d) Review and evaluate departmental affirmative action programs to insure that they comply with federal statutes and regulations.

"(e) Establish requirements for improvement or corrective action to eliminate the underutilization of minorities and women.

"(f) Provide statewide training to departmental affirmative action officers who will conduct supervisory training on affirmative action.

"(g) Review, examine the validity of, and update qualifications standards, selection devices, including oral appraisal panels and career advancement programs.

"(h) Maintain a statistical information system designed to yield the data and the analysis necessary for the evaluation of progress in affirmative action and equal employment opportunity within the state civil service. Such statistical information shall include specific data to determine the underutilization of minorities and women. The statistical information shall be made available during normal working hours to all interested persons. Data generated on a regular basis shall include, but not be limited to, the following:

"(1) Current state civil service work force composition by race, sex, age, department, salary level, occupation, and attrition rates by occupation.

"(2) Current local and regional work force and population data of women and minorities.

"(i) Data analysis shall include, but not be limited to, the following:

"(1) Data relating to the utilization by department of minorities and women compared to their availability in the labor force.

"(2) Turnover data by department and occupation.

"(3) Data relating to salary administration, such as average salaries by race and sex, and comparisons of salaries within state service and comparable state employment.

"(4) Data on employee age, and salary level compared among races and sexes.

"(5) Data on the number of women and minorities recruited for, participating in and passing state civil service examinations. Such data shall be analyzed pursuant to the provisions of Sections 19704 and 19705.

"(6) Data on the job classifications, geographic locations, separations, salaries, and other conditions of employment which provide additional information about the composition of the state civil service work force."

Section 19792.5: "(a) In order to permit the public to track the 'glass ceiling' patterns affecting women and minorities in state civil service, the State Personnel Board shall annually track, by incremental levels of ten thousand dollars ($10,000), the salaries of women and minorities in state civil service up to the level of one hundred thousand dollars ($100,000). For purposes of this subdivision, 'glass ceiling' means the artificial barrier caused by discriminatory employment practices that prevents or hinders the advancement of women and minorities to better paying and higher level positions.

"(b) The board shall report salary data collected pursuant to subdivision (a) to the Governor and the Legislature in its Annual Census of State Employees and Affirmative Action Report, and shall include in this report information regarding the progress of women and minorities in attaining high level positions in state employment and affirmative action efforts made in this regard. The salary data shall be reported in annual increments of ten thousand dollars ($10,000) by job category, minority group, and gender in a format easily understandable by the public."

Section 19793: "By November 15 of each year beginning in 1978, the State Personnel Board shall report to the Governor, the Legislature, and the Department of Finance on the accomplishment of each state agency and department in meeting its stated affirmative action goals for the past fiscal year. The report shall include information to the Legislature of laws which discriminate or have the effect of discrimination on the basis of race, color, religion, national origin, political affiliation, sex, age, or marital status. The Legislature shall evaluate the equal employment opportunity efforts and affirmative action progress of state agencies during its evaluation of the Budget Bill."

Section 19794: "In cooperation with the State Personnel Board, the director of each department shall have the major responsibility for monitoring the effectiveness of the affirmative action program of the department."

Section 19795: "(a) The secretary of each state agency and the director of each state department shall appoint an affirmative action officer, other than the personnel officer, except in a department with less than 500 employees the affirmative action officer may be the personnel officer who shall report directly, and be under the supervision of, the director of the department, to

develop, implement, coordinate, and monitor the agency or departmental affirmative action program. The departmental or agency affirmative action officer shall, among other duties, analyze and report on appointments of employees, request appropriate action of the departmental director or agency secretary, submit an evaluation of the effectiveness of the total affirmative action program to the State Personnel Board annually, monitor the composition of oral panels in departmental examinations, and perform other duties necessary for the effective implementation of the departmental and agency affirmative action plans.

"(b) Each state agency shall establish a committee of employees who are individuals with a disability to advise the head of the agency on matters relating to the formulation and implementation of the plan to overcome and correct any underrepresentation determined pursuant to Section 19234."

Section 19796: "Bureau or division chiefs within a department or agency shall be accountable to the department director for the effectiveness and results of the program within their division or bureau. Each bureau or division may assign an administrator to assist the departmental affirmative action officer.

"All management levels, including firstline supervisors, shall provide program support and take all positive action necessary to ensure and advance equal employment opportunity at their respective levels."

Section 19797: "Each state agency and department shall develop, update annually, and implement an affirmative action plan which shall at least identify the areas of underutilization of minorities and women within each department by job category and level, contain an equal employment opportunity analysis of all job categories and levels within the hiring jurisdiction, and include an explanation and specific actions for improving the representation of minorities and women."

Section 19798: "In establishing order and subdivisions of layoff and reemployment, the board, when it finds past discriminatory hiring practices, shall by rule, adopt a process that provides that the composition of the affected work force will be the same after the completion of a layoff, as it was before the layoff procedure was implemented. This section does not apply to state employees in State Bargaining Unit 5, 6, or 8."

Section 19799: "When any state agency conducts any survey as to the ancestry or ethnic origin of state civil service employees, or maintains any statistical tabulation of minority group employees, it shall use separate

collection categories for each major Asian and Pacific Islander group, including, but not limited to, Chinese, Japanese, Filipino, Korean, Vietnamese, Asian Indian, Hawaiian, Guamanian, Samoan, Laotian, and Cambodian in the survey or tabulation."

Appendix D

Community Colleges

The following sections of the Education Code are applicable to community colleges:

Section 87100: "The Legislature finds and declares that:

"(a) Generally, California Community Colleges employ a disproportionately low number of racial and ethnic minority classified employees and faculty and a disproportionately low number of women and members of racial and ethnic minorities in administrative positions.

"(b) It is educationally sound for the minority student attending a racially impacted school to have available the positive image provided by minority classified and academic employees. It is likewise educationally sound for the student from the majority group to have positive experiences with minority people which can be provided, in part, by having minority classified and academic employees at schools where the enrollment is largely made up of majority group students. It is also educationally important for students to observe that women as well as men can assume responsible and diverse roles in society.

"(c) Past employment practices created artificial barriers and past efforts to promote additional action in the recruitment, employment, and promotion of women and minorities have not resulted in a substantial increase in employment opportunities for such persons.

"(d) Lessons concerning democratic principles and the richness which racial diversity brings to our national heritage can be best taught by the presence of staffs of mixed races and ethnic groups working toward a common goal.

"It is the intent of the Legislature to establish and maintain a policy of equal opportunity in employment for all persons and to prohibit discrimination based on race, sex, color, religion, age, handicap, ancestry, or national origin in every aspect of personnel policy and practice in employment, development, advancement, and treatment of persons employed in the public school system, and to promote the total realization of equal employment opportunity through a continuing affirmative action employment program.

"The Legislature recognizes that it is not enough to proclaim that public employers do not discriminate in employment but that effort must also be

made to build a community in which opportunity is equalized. It is the intent of the Legislature to require educational agencies to adopt and implement plans for increasing the numbers of women and minority persons at all levels of responsibility."

Section 87101: "For the purposes of this article:

"(a) 'Affirmative action employment program' means planned activities designed to seek, hire, and promote persons who are underrepresented in the work force compared to their number in the population, including handicapped persons, women, and persons of minority racial and ethnic backgrounds. It is a conscious, deliberate step taken by a hiring authority to assure equal employment opportunity for all staff, both academic and classified. These programs require the employer to make additional efforts to recruit, employ, and promote members of groups formerly excluded at the various levels of responsibility who meet statewide minimum qualifications, if any, and who, relative to local qualifications beyond the statewide minimum qualifications, are qualified or may become qualified through appropriate training or experience within a reasonable length of time. The programs should be designed to remedy the exclusion, whatever its cause. Affirmative action requires imaginative, energetic, and sustained action by each employer to devise recruiting, training, and career advancement opportunities which will result in an equitable representation of women and minorities in relation to all employees of the employer.

"(b) 'Goals and timetables' means projected new levels of employment of women and minority racial and ethnic groups to be attained on an annual schedule, given the expected turnover in the work force and the availability of persons who are, relative to local qualifications beyond the statewide minimum qualifications, qualified or may become qualified through appropriate training or experience within a reasonable length of time. Goals are not quotas or rigid proportions. They should relate both to the qualitative and quantitative needs of the employer.

"(c) 'Public education agency' means the office of the chancellor and the governing board of each community college district in California."

Section 87102: "(a) The governing board of each community college district shall periodically submit, to the Board of Governors of the California Community Colleges an affirmation of compliance with the provisions of this article. The affirmative action employment program shall have goals that ensure participation in, and commitment to, the program by district personnel, and timetables, for its implementation. The affirmative action

plan shall include steps that the district will take in meeting and improving hiring goals for both full-time faculty and part-time faculty pursuant to Section 87482.6, and the development of the plan shall be a condition for receipt of allowances pursuant to that section.

"The governing board of each community college district shall be held accountable pursuant to this article and other applicable provisions of law for the success or failure of its affirmative action employment program. The plans shall be a public record within the meaning of the California Public Records Act (Chapter 3.5 (commencing with Section 6250) of Division 7 of Title 1 of the Government Code).

"(b) The governing board of each community college district shall publish and distribute a record of the success rate of measurable progress, with respect to its goals and timetables, in hiring employees through its affirmative action employment program. This publication shall be a public record within the meaning of the California Public Records Act, and shall include data and information specified by the board of governors."

Section 87103: "The office of the Chancellor of the California Community Colleges shall render assistance in developing and implementing affirmative action employment programs to community college districts under its jurisdiction."

Section 87104: "(a) The Board of Governors of the California Community Colleges, out of funds appropriated for these purposes, (1) shall provide assistance to local community colleges in adopting and maintaining high-quality affirmative action programs; (2) report to the Legislature regarding the number of districts which have adopted and are maintaining affirmative action programs, including the effectiveness of the programs in meeting the intent of this article; (3) develop and disseminate to public community college districts guidelines to assist these agencies in developing and implementing affirmative action employment programs; and (4) shall establish a technical assistance team to review the affirmative action plan of each community college district which fails to make measurable progress in meeting the goals and timetables of its adopted plan. The technical assistance team shall recommend appropriate actions to assure reasonable progress in improving success rates. The board of governors shall prescribe those conditions necessary to assure reasonable progress and otherwise meet the legal requirements of affirmative action. The conditions may include the withholding of allowances made pursuant to Sections 87482.6 and 87107.

"(b) The board of governors shall establish, by July 1, 1989, within the chancellor's office or through other means as deemed necessary, a major

service function to assist community college districts in identifying, locating, and recruiting qualified members of underrepresented groups, and in establishing and maintaining effective affirmative action hiring procedures.

"(c) The board of governors shall, by March 15, 1989, develop and adopt a systemwide plan for strengthening faculty and staff affirmative action policies and programs in the California Community Colleges."

Section 87105: "The Board of Governors of the California Community Colleges shall adopt all necessary rules and regulations to carry out the intent of this article."

Section 87106: "Any activities undertaken pursuant to this article shall be subject to the provisions of Title VII of the Federal Civil Rights Act of 1964, and amendments thereto."

Section 87107: "(a) There is hereby created in the State Treasury a fund which shall be known as the Faculty and Staff Diversity Fund. The money in the fund shall be available to the board of governors upon appropriation by the Legislature for the purpose of enabling the California Community Colleges as a system to address the goal that by the year 2005 the system's work force will reflect proportionately the adult population of the state. For the purpose of administering this fund, the board of governors shall develop and apply availability data and factors for measuring district progress in contributing to this goal for the system. Also for the purpose of administering this fund, it is the intent of the Legislature that the board of governors take the steps which are necessary to reach the goal that by fiscal year 1992-93, 30 percent of all new hires in the California Community Colleges as a system will be ethnic minorities.

"(b) By December 1, 1993, the board of governors shall report upon and assess the extent to which the California Community Colleges as a system have met or begun to meet the goals specified in this section. The report shall include conclusions regarding any necessary revisions to these goals. Unless provided otherwise by the Legislature by statute, the board of governors may, on or after September 30, 1994, adopt regulations to revise these goals.

"(c) The board of governors shall utilize up to 25 percent of the fund to do all of the following:

"(1) Reimburse districts for the costs of publishing, distributing, and reporting affirmative action success rates as provided in Section 87102.

"(2) Reimburse districts for the cost of preparing and updating affirmative action plans.

"(3) Carry out the assistance, service, monitoring, and compliance functions specified in Section 87104.

"(d) The remainder of the fund shall be allocated to districts, in accordance with regulations of the board of governors, to provide for extended outreach and recruitment of underrepresented groups, for incentives to hire members of underrepresented groups, for in-service training and for other related staff diversity programs.

"(e) It is the intent of the Legislature that the board of governors, in administering this fund, shall, pursuant to the provisions of this article, give funding priority and shall afford flexibility and discretion in the use of these funds to districts which have made or are making reasonable progress in contributing to the achievement of the goals of this fund."